**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE: 1:17:cv-21559 KMW**

MENUDO INTERNATIONAL, LLC
A Florida LLC

Plaintiff,

v.

IN MIAMI PRODUCTION, LLC.
A Florida LLC., Maria Cristina Bruan, an individual,
et. al.

Defendants.

_____

## DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

NOW COMES the Defendants In Miami Production, LLC ("IMP") and Maria Cristina

Bruan ("Bruan") and for their Response In Opposition to the Plaintiff's Motion for Preliminary

Injunction states as follows:

## I. INTRODUCTION

The Plaintiff is not using the MENUDO trademark in commerce.  IMP has used the mark

continuously in commerce for over two years.  Each of the Plaintiff's attempts to register the

mark have been cancelled or are pending on a mere intent to use basis.  The Plaintiff learned of

IMP's use for nearly two years before moving for an injunction.  The Plaintiff cannot obtain the

extraordinary remedy of a preliminary injunction under these circumstances.

## II. STATEMENT OF FACTS

### A.  About the Defendant

IMP provides services for live musical groups, including artist management,

development, booking and promotions. *See* Group Exhibit A, Cristina Bruan Declaration ("CB

1

Dec") at ¶5. One of IMP's musical groups is a group of male performers that were former members of the internationally renowned Puerto Rican boy band called "Menudo". *Id* at ¶6.

### B. The History of Menudo

"Menudo" was originally a Puerto Rican boy band that was formed in the 1970s by producer Edgardo Diaz and his related entities. *Id.* at ¶¶7-8. Releasing their first album in 1977, the band achieved much success, especially during the 1980s, becoming the most popular Latin American teen musical group of the era. *Id.* at ¶¶8-9.

The days of Menudo ended when it released its last album in 1996. *Id.* at ¶10. That same year the rights and the name Menudo were sold to a Panamanian Company, Vanyx Inc. *Id.* at ¶10. Many of the performers left the group but the remaining line-up formed a new group under the name MDO.[1] *Id.* at ¶11.

### C. The Menudo Trademarks

Several MENUDO trademarks were filed and registered by Mr. Diaz's company in 1983 but were cancelled due to non-use. *Id.* at ¶12. In 2000 Y2 Musica Inc., a corporation allegedly owned by Oscar Llord, submitted an application to the USPTO for the trademark MENDUO for "compact disks and cassettes featuring pre-recorded music." *Id.* at ¶13. The application stated that the first use of the mark in commerce was June 5, 1977 (the date Menudo released its first album). *Id.* On March 27, 2002 the trademark registration was assigned to Ole, LLC and on January 19, 2004 was assigned from Ole, LLC to Menudo Entertainment LLC ("Menudo Entertainment"). *Id.* at ¶14. This trademark registration was cancelled on December 16, 2011 because Menudo Entertainment failed to file a declaration of use. *Id.*

---

[1] Upon information and belief, neither the Plaintiff nor its alleged predecessor in interest objected to the use of the MDO mark.  A failure to actively police trademark rights results in a forfeiture or waiver of those rights. *Tally—Ho,*

In 2004, around the time Menudo Entertainment acquired Y2 Musica's Ole LLC registration trademark registration, it also filed several applications to register MENUDO for "Entertainment services, namely, providing a web site featuring musical performances..." *Id.* at ¶15.  However, this application was filed on an intent-to-use basis and was not registered until Menudo Entertainment filed a Statement of Use in 2006. *Id.* This registration was cancelled on June 28, 2013 for failure to file a declaration of use under Section 8. *Id.* Menudo Entertainment also filed intent to use applications for MENUDO for "Prerecorded DVDs featuring music and musical performances…" and "Live performances…". at ¶16. This application became a registration in May 2008 but was subsequently cancelled in December 2014 for failure to file a declaration of use under Section 8. *Id.*

In 2006 Menudo Entertainment filed *another* intent to use application for MENUDO for "Live entertainment" and the MENUDO mark was registered in 2008. Once again, in November 2014 the registration was cancelled for failure to file a declaration of use. *Id.* at ¶17. Menudo Entertainment also filed an intent to use application for MENUDO for posters, stickers, t-shirts, sweatshirts, hats, caps in 2004. *Id.* at ¶18. This application was not registered until March 30, 2010 and was cancelled in November 2016 for failure to file a declaration of use under Section 8. *Id.* On June 26, 2013 Menudo Entertainment filed an application to register MENUDO for "Entertainment services, namely, providing a web site featuring musical performances, musical videos..." *Id.* at 19. The application included a false declaration that MENUDO was being used in commerce at the time the application was filed. This representation is false because no one was using the MENUDO trademark in 2013. *Id.* Menudo Entertainment obtained the registration for MENUDO by fraudulently making this representation to the United States Patent and Trademark Office (the "USPTO"). *Id.*

### D.  The Return of Menudo

In 2007 MTV announced that Menudo would return and it would find new band members though a reality television series entitled "Making Menudo". *Id.* at ¶20.   The show debuted on October 25, 2007 and concluded on November 20, 2007. *Id.* The new members went on a brief tour together in 2008, but shortly thereafter the group disbanded in early 2009. *Id.* at ¶21. As stated on the Plaintiff's website "MENUDO went dormant in 2009 to the disappointment of millions of fans around the world." *Id.* No one used the MENUDO mark in commerce (or in any manner) between 2009 and 2014. *Id.* at ¶¶22, 55.

In 2014 IMP began working with former members of Menudo when they expressed their desire to return to the stage and make a living performing once again. *Id.* at ¶23. *See also* Group Exhibit B (Band Dec) . In August 2015 Mrs. Bruan, the principal of IMP, was introduced to Carlos Pimentel, who at the time claimed to be the owner of the MENUDO trademarks through Global Entertainment, an entity that allegedly owned Menudo Entertainment. *Id.* at ¶24. Mr. Pimentel and Ms. Bruan met and agreed to work on a licensing agreement so that IMP could use the MENUDO trademark for upcoming concerts where 13 of the 37 former Menudo members would reunite and perform for their fans. *Id.* at ¶25. Mr. Pimentel provided verbal and written authorization for IMP to use the name while legal documents were allegedly in the process of being drafted. *Id.* at ¶26. During this period, while researching the history of the MENUDO trademarks it became clear to IMP and Ms. Bruan that neither Mr. Pimentel nor Menudo Entertainment actually had any authority to control the use of the MENUDO trademarks. *Id.* at ¶27.  As a result, IMP reached no agreement with Mr. Pimentel or Menudo Entertainment regarding the Menudo trademarks. *Id.*

4

On January 31, 2015, IMP presented its first concert with the former Menudo members in Miami, Florida under the banner "El Reencuentro" ("The Reunion"). *Id.* at ¶28. While the first concert was a success, it was not obvious to fans that this was the reunion of Menudo members. *Id.* at ¶28. The band that once proclaimed to be bigger than the Beatles after breaking attendance records in many countries and more than 30 million albums sold worldwide, record breaking albums produced in five different languages did not even have an official website, Facebook page or online store. *Id.* at ¶29. IMP saw the public's desire to reunite with Menudo and took that opportunity to bring Menudo back to its dedicated fans. *Id.*

In May 2015, IMP presented concerts featuring former Menudo members in New York and Florida under the touring name El Reencuentro. *Id.* at ¶30. In October, November and December 2015, IMP produced shows in Mexico and Ecuador under the touring name MENUDO. *Id.* at ¶31. In February 2016 IMP hosted a convention for Menudo super fans where it presented live musical performances by former Menudo members and sold related merchandise using the trademarks MENUDO, MENUDO MANIA, MENUDOMANIA4EVER and MENUDO MANIA FOREVER (the "MENUDO MANIA Marks"). *Id.* at ¶32. Shortly thereafter, IMP launched a website www.Menudomania4ever.com to support its tour. *Id.* at ¶32.

Since 2015 IMP has produced, promoted and sold over 18 concert events using the MENUDO MANIA Marks. *Id.* at ¶33. All of the concert's promotional and advertising material consistently and clearly states that the tour is comprised of five or more former members of Menudo from the 1980s and 1990s. *Id.* at ¶34. IMP has invested significant sums of money, approximately more than $280,000.00, plus time and various resources in promoting and developing the MENUDO MANIA Marks. *Id.* at ¶35. IMP's productions provide work and

financial stability to more than 11 of the 35 former members of Menudo and to more than 15 musicians and crew on tour. *Id.* at ¶36.

### VI.  The Conflict with Plaintiff

IMP planned to bring its Menudo Mania tour to Mexico.  Accordingly, IMP applied to register the trademark MEUDO with the Mexican Trademark Office. *Id.* at ¶39. On March 18, 2016 Mr. Pimentel emailed Mrs. Bruan to express their disapproval of her use of the name Menudo to reference her tour. *Id.* at ¶40. On May 2, 2016 counsel for Big Bar Entertainment, allegedly another predecessor of the Plaintiff, sent a cease and desist letter, with a clear threat to sue Ms. Bruan and IMP for their use of the MENUDO MANIA Marks. *Id.* at ¶41.  Without providing any actual evidence, Big Bar claimed that they had the exclusive right to the MENUDO trademark. *Id.* In October 2016 the Plaintiff filed an opposition to IMP's trademark application in Mexico. *Id.*at ¶42.

IMP, with the assistance of counsel, began investigating the Plaintiff's alleged trademark rights. *Id.* at ¶43. The Plaintiff only had a single "live" registration that appeared to be obtained by misrepresenting its use to the USPTO. *Id.* at ¶43. The Plaintiff also filed two additional trademark applications to register MENUDO on an intent to use basis. *Id*. at ¶44. On January 19, 2017 IMP filed an opposition to the Plaintiff's pending application for MENUDO. *Id.* at ¶45. On March 29, 2017 the parties had a mandatory settlement and discovery conference pursuant to the Trademark Trial and Appeal Board's scheduling order. *Id.* at ¶46. During the conference the Plaintiff threatened a trademark infringement action based upon its belief that its rights were valid. *Id.* IMP repeatedly requested that the Plaintiff provide some evidence of its use of the MENUDO trademark, but to no avail. *Id.*

On March 28, 2017 IMP filed a petition to cancel the Plaintiff's registered trademark based upon fraud on the USPTO, among other things. *Id.* at ¶47. On April 26, 2017 the Plaintiff's trademark counsel sent attorneys for IMP another demand letter with a copy of the Complaint at issue. *Id.* at ¶48. On June 5, 2017 IMP filed its Answer, Affirmative Defenses and Counterclaims. *Id.* at 51. Without any prior notice, the Plaintiff filed the instant Motion for a Preliminary Injunction. *Id.* at ¶52.

**III. LEGAL STANDARD**

It is well established that "[a] preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the burden of persuasion' as to all four elements." *Siegel,* 234 F.3d at 1176. Accordingly, the Plaintiff bears the burden of establishing ***each*** of the following four elements: (1) that there is a substantial likelihood of success on the merits; (2) that the Plaintiff will be irreparably harmed if injunctive relief is denied; (3) that the threatened injury outweighs whatever damage the injunction may cause to the alleged infringer; and, (4) that the injunction, if issued, will not be adverse to the public interest. *Siegel v. LePore*, 234 F.3d 1163, 1175 (11th Cir. 2000) (en banc)).

Generally, the first element is the most important because granting a temporary restraining order or motion for preliminary injunction would be inequitable if the movant has no chance of success on the merits. *Gonzalez v. Reno*, No. 00-11424-D, 2000 U.S. App. LEXIS 7025, 2000 WL 381901, *1 (11th Cir. 2000)). "If the movant is unable to establish a likelihood of success on the merits, a court need not consider the remaining conditions prerequisite to injunctive relief*." Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1247 (11th Cir. 2002) (citing *Pittman v. Cole*, 267 F.3d 1269 (11th Cir. 2001).

**IV. ARGUMENT**

### A.  PLAINTIFF WILL NOT PREVAIL ON THE MERITS OF ANY OF ITS CLAIMS

**1. Plaintiff's Trademark Infringement Claim Fails Because It Does Not Have Trademark Rights In the MENUDO Mark.**

To demonstrate a reasonable likelihood of succeeding under section 43(a) of the Lanham Act, Plaintiff must establish *both* "(1) that it has trademark rights in the mark or name at issue… and (2) that the defendant adopted a mark or name that was the same, or confusingly similar to the plaintiff's mark, such that there was a likelihood of confusion." *SunAmerica Corp. v. Sun Life Assurance Co. of Can.,* 77 F.3d 1325, 1343 (11th Cir. 1996) citing *Conagra, Inc. v. Singleton*, 743 F.2d 1508, 1512 (11th Cir. 1984).  The Plaintiff is not likely to succeed on its claim for trademark infringement because it is unclear from the record what trademark rights, if any, it has in the MENUDO mark.  While the Plaintiff baldly asserts in its Motion that it is the alleged assignee of "all rights" to MENUDO dating back to the 1970s there is no evidence – not a single declaration or document – in support of this contention. It is unclear what rights belong to the Plaintiff, how it obtained those rights and to what extent, if any, it has the right to exclusively use the MENUDO mark.  The Plaintiff's claims against IMP appear to be based upon a single invalid trademark registration for the MENUDO mark. *See* Pl. Ex. A. at p. 2.[2]

The Plaintiff's claim that it has trademark rights in the MENUDO mark is invalid for three reasons.  *First*, the trademark registration that forms the basis for the Plaintiff's claims was obtained by fraud because there is no evidence that the MENUDO mark was being used in commerce as of the June 26, 2013 filing date.  *Second*, the Plaintiff has not demonstrated that it has *any* common law rights in the MENUDO mark.  *Third,* the Plaintiff has abandoned through non-use any rights it might have previously had in the MENUDO mark.

---

[2] The remainder of Pl. Ex. A are intent to use applications for the mark MENUDO and cannot form the basis of an infringement claim under the Lanham Act.

**(a) The Trademark Registration Was Obtained By Fraud on the USPTO.**

The Plaintiff's alleged predecessor in interest, Menudo Entertainment, LLC (hereinafter, the "Prior Applicant"), filed an application and obtained a registration for the trademark for MENUDO by fraud.[3]  This trademark registration is the sole apparent basis for the Plaintiff's claims.  The application for MENUDO was filed on June 26, 2013 as a Section 1(a) actual use application in international class 41 for: "Entertainment services, namely, providing a web site featuring musical performances, musical videos…" The application states, under oath, that its first use of the mark in commerce by the Prior Applicant or its alleged predecessor in interest was June 15, 2006.[4]  *See id.* It also states, under oath, that the mark "is now in use in such commerce." *See id.* This statement is false. There is no proof in the record that the Prior Applicant was using the mark in commerce on June 26, 2013. The Plaintiff has failed to provide IMP or this Court any record evidence of use in commerce.  The Plaintiff cannot and has not demonstrate that it was using the mark in 2013, nor can it show *any* use of the mark in commerce with respect to the registered goods and services since 2013.  As a result, its attempt to obtain an injunction based upon this fraudulently obtained trademark registration should be denied.

As stated *supra* the Plaintiff and its alleged predecessors had numerous trademark registrations that were *all* cancelled for failure to file any acceptable specimen demonstrating current use of the MENUDO trademark in commerce. This is strong evidence that the Plaintiff could not have possibly had any actual or legitimate use of the MENUDO Mark in commerce in 2013.

---

[3] The motion is void of any *evidence* that the Plaintiff is actually the predecessor in interest.  IMP reserves the right to seek leave to file a surreply in the event that the Plaintiff attempts to produce such evidence in its reply brief.

[4] This directly contradicts Plaintiff's claims that it owns rights in the mark dating back to 1995. *See* Pl. Motion at p. 3.

**(b)   Any Alleged Common Law Rights in the MENUDO Mark Have Not Been Clearly Established.**

Throughout the Plaintiff's motion for a preliminary injunction, the Plaintiff vaguely asserts that it has the "common law" rights in the MENUDO mark.  This single bald claim cannot provide an adequate basis to obtain an injunction in the Eleventh Circuit. *United States v. Jefferson County,* 720 F.2d 1511, 1519 (11th Cir 1983) ( "The burden of persuasion in all of the four requirements is at all times upon the plaintiff."). While it is true that "the use of another's unregistered, i.e., common law, trademark can constitute a violation of § 43(a) where the alleged unregistered trademarks used by the plaintiff are so associated with its goods that the use of the same or similar marks by another company constitutes a false representation that its goods came from the same source," *Conagra, Inc. v. Singleton*, 743 F.2d 1508, 1512--13 (11th Cir. 1984), only those marks that are capable of distinguishing the owner's goods from those of others, are eligible for federal registration or protection as common law marks under the Lanham Act. 15 U.S.C. § 1052(e), (f).  There has been no such showing here, and the Plaintiff's motion – to the extent that it is based upon common law rights – should be denied.

**(c) The Plaintiff Has No "Use" of the Mark in Commerce and Has Abandoned any Rights it May Have Once Had in the MENUDO Mark.**

Even if this Court concludes that the Plaintiff's trademark registration is valid, or that it at one time had common law rights in the Menudo mark, its motion must be denied because the Plaintiff abandoned its rights in the MENUDO mark by failing to consistently and continuously use the MENUDO mark in commerce. "A defendant must establish two elements in order to show that a plaintiff has abandoned his trademark: (1) that the plaintiff has ceased using the mark in dispute and (2) that he has done so with an intent not to resume its use." *Natural Answers, Inc. v. SmithKline Beecham Corp.*, 529 F.3d 1325, 1329-1330 (11th Cir. 2008) quoting *Cumulus*

*Media, Inc. v. Clear Channel Commc'ns, Inc.,* 304 F.3d 1167, 1173 (11th Cir. 2002). For the purposes of abandonment, the Lanham Act defines "use" as "the bona fide use of such mark made in the ordinary course of trade, and not made merely to reserve a right in a mark." 15 U.S.C. § 1127. "Non-use for 3 consecutive years shall be *prima facie* evidence of abandonment." 15 U.S.C. § 1127.

The Plaintiff claims that "since 2015, and continuing through the present, Plaintiff has marketed, distributed, and/or sold its good and services bearing the Mark and similar variations. Plaintiff has expended significant time, energy and money to obtain, preserve and develop the goodwill associated with the Mark and the MENUDO brand." Dkt. 16 at p. 3.  Aside from this unverified allegation, the Plaintiff provides no examples or evidence of any lawful use in commerce bearing the MENUDO mark.  There is not one scintilla of evidence in this record "clearly establishing" that this Plaintiff has *ever* used the mark.

Once a mark is abandoned it "falls into the public domain and is free for all to use. . . . Abandonment paves the way for future possession and property in any other person." J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 17:1 (4th ed. 2001); *see also Abdul-Jabbar v. Gen. Motors Corp.*, 85 F.3d 407, 411 (9th Cir. 1996)  ("Rather than countenancing the 'removal' or retirement of the abandoned mark from commercial speech, trademark law allows it to be used by another.").  Thus, a defendant who successfully shows that a plaintiff has abandoned a mark is free to use the mark without liability to the plaintiff. *Cumulus Media, Inc. v. Clear Channel Commc'ns, Inc.*, 304 F.3d 1167, 1173 (11th Cir. 2002).  Any rights the Plaintiff had in the MENUDO mark were abandoned and returned to the public domain for anyone, including IMP, to use without facing any liability under the Lanham Act.

**2. The Plaintiff's Trademark Infringement Claim Fails Because There Is No Likelihood of Confusion and IMP's Use is a Fair Use.**

Even if Plaintiff has a valid trademark in MENUDO the Court is not likely to find a likelihood of confusion between IMP's marks and the Plaintiff's alleged MENUDO Mark.  The 11th Circuit considers seven factors in assessing whether or not a likelihood of consumer confusion exists: (1) the strength of the allegedly infringed mark; (2) the similarity of the infringed and infringing marks; (3) the similarity of the goods and services he marks represent; (4) the similarity of the parties' trade channels and customers; (5) the similarity of advertising media used by the parties; (6) the intent of the alleged infringer to misappropriate the proprietor's good will; and (7) the existence and extent of actual confusion in the consuming public. *Fla. Int'l Univ. Bd. of Trs. v. Fla. Nat'l Univ., Inc.*, 830 F.3d 1242, 1255 (11th Cir. 2016) citing *Tana v. Dantanna's*, 611 F.3d 767, 774-75 (11th Cir. 2010).

**(a) Strength of the Plaintiff's Mark**

The first factor looks to the strength of the Plaintiff's MENUDO Mark. The stronger the mark, the greater protection it is entitled and the weaker the mark, the less protection it receives. *See Fla. Int'l Univ.,* 830 F3d at 1256. The fact finder should assess the strength of the mark in two ways: first by classification (generic, descriptive, suggestive or arbitrary) and second "the degree to which third parties make use of the mark." *Id.* quoting *Frehling Enters. v. Int'l Select Group, Inc.,* 192 F.3d 1330, 1335 (11th Cir. 1999). "The less that third parties use the mark, the stronger it is, and the more protection it deserves." *Id.*

IMP does not dispute that the Menudo band was the most popular Latin American teen musical group in the 1980s and was arguably one of the most popular pop acts in the world. Unfortunately for the Plaintiff, the strength associated with the former MENUDO Mark at the height of the band's popularity is not an indication that this Plaintiff is the source or origin of those famous services. In other words, there is no secondary meaning in relation to the Plaintiff's

alleged ownership in the MENUDO Mark. The Court considers four factors in assessing secondary meaning: (1) "the length and nature of the name's use," (2) "the nature and extent of advertising and promotion of the name," (3) **"the efforts of the proprietor to promote a conscious connection between the name and the business," and (4) "the degree of actual recognition by the public that the name designates the proprietor's product or service."** *Welding Servs.,* 509 F.3d at 1358 (emphasis added). There is simply no connection between the original MENUDO mark and the Plaintiff's business. Consumers do not associate the Plaintiff with the band Menudo; the Plaintiff has done nothing to use the mark in commerce.  As a result, this factor favors IMP.

### (b) Similarity of the Marks

"The second factor in the likelihood-of-confusion analysis requires the fact finder to compare the plaintiff's marks with the defendant's marks and measure their similarity…Two marks need not be identical to support a finding of infringement, and the key question remains whether the marks are sufficiently similar "'to deceive the public.'"  *Fla. Int'l Univ. Bd. of Trs.*, 830 F.3d at 1260 (internal citations omitted). The Court should look at the appearance, sound and meaning of the marks, and the manner in which the marks are used. *Id.*

The Plaintiff's alleged mark is MENUDO, which has not been used by this Plaintiff in commerce, and has not been used by its alleged predecessor for many years (there is no evidence of any use of the MENUDO mark in the preliminary injunction record by anyone other than IMP). IMP admittedly also uses the mark MENUDO on its merchandise, but it has primarily used and will continue to use the following marks to brand its live musical performances by former actual members of the Menudo Band: MENUDO MANIA, MENUDOMANIA FOREVER and MENUDOMANIA4EVER (the "MENUDO MANIA Marks"). Because IMP's

tour was to celebrate the band's 40th anniversary, it called its tour the "MENUDOMANIA FOREVER" Tour.  As such, IMP's marks MENUDO MANIA, MENUDO MANIA FOREVER and MENUDOMANIA4EVER create a completely different overall commercial impression than the Plaintiff's unused alleged mark.

### (c) Similarity of the products

The third factor asks whether the parties' services "are the kind that the public attributes to a single source." *Fla. Int'l Univ. Bd. of Trs.,* 830 F.3d at 1261 quoting *Frehling Enters*., 192 F.3d at 1338. The test is not whether the products can be readily distinguished, but rather whether the goods are "so related in the minds of consumers that they get the sense that a single producer is likely to put out both goods." *Id*. The focus is on "the reasonable belief of the average consumer as to what the likely source of the goods [is]." *Id.*

There is no similarity between the Plaintiff and IMP's goods and/or services because the Plaintiff has not provided any evidence of the good or services it offers to consumers.  The Plaintiff claims that it has a band that performs live and recorded music. This is not true.  The Plaintiff has provided this Court with no evidence of its allegedly active use of the MENUDO mark and IMP is not aware of any other group performing under the name MENUDO.

For the sake of argument, even if the Court assumes that the Plaintiff's goods and services are those stated in its alleged predecessor's trademark registration, consumers would still not be confused because IMP's goods and services are different.  The Plaintiff's registration is for a "website featuring musical performances, musical videos…." On the other hand, IMP is promoting reunion concerts performed by former Menudo band members and selling related apparel and merchandise. There is no evidence that the Plaintiff has done *any* live performances, concerts, or entertainment or sold any related merchandise. In fact, the Plaintiff's alleged

14

predecessor in interest's trademark registration for MENUDO with respect to "live performances by a musical group" was cancelled because that application contained no specimen demonstrating a use in commerce in 2014.  If the Plaintiff was or is currently providing live musical performances there would be no need to file its 2016 application on a Section 1(b) ***intent to use*** basis; any rights holder actually using the mark in commerce is required to file under Section 1(a) (use in commerce basis).  .

    **(d) Similarity of the parties' trade channels and customers**

    The fourth factor considers where, how, and to whom the parties' products are sold. *Fla. Int'l Univ. Bd. of Trs.*, 830 F.3d at 1261 citing *Frehling Enters*., 192 F.3d at 1339.  The Plaintiff's allegation that it and IMP "have the exact same market and customers" and that both parties "uses the internet, booking agents, concert venues, identical marketing channels and target the same audiences for their performances and recordings" is wrong.  The Plaintiff has not identified where or how it uses the internet to promote any goods or services, who its booking agents are, what concert venues it allegedly provides its services in or to, how it markets its goods and services or who comprises its target audience. The Plaintiff's customers do not exist. Without goods and services the Plaintiff cannot have customers, and cannot be entitled to injunctive relief.

    **(e) Similarity of advertising media**

    This factor compares the parties' advertisements and the audiences they reach. *See Sovereign Military Hospitaller Order of Saint John v. Fla. Priory of the Knights Hospitallers of the Sovereign Order of Saint John*, 809 F.3d 1171, 1188 (11th Cir. 2015).  The Plaintiff has not identified where or to whom it advertises so any analysis under this factor is impossible. This factor weighs in favor of IMP.

**(f) IMP's intent**

In examining this factor the Court has to determine whether IMP "had a conscious intent to capitalize on the plaintiff's business reputation, was intentionally blind, or otherwise manifested improper intent" in adopting its name. *Fla. Int'l Univ. Bd. of Trs.*, 830 F.3d at 1263 citing *Custom Mfg. & Eng'g, Inc. v. Midway Servs.*, Inc., 508 F.3d 641, 648 (11th Cir. 2007). IMP's various marks, including the MENUDO MANIA Marks, were not used with an intent to capitalize off of the Plaintiff's alleged goodwill. Rather, the inclusion of the MENUDO Mark was to identify that the tour would feature musical performances by former members of the Menudo band.  It is also impossible to capitalize on the Plaintiff's business when the Plaintiff is not doing any business in commerce using the MENUDO mark.

**(g) Actual Confusion**

"Evidence of confusion by actual or potential customers is, of course, the best evidence of a likelihood of confusion." *Fla. Int'l Univ. Bd. of Trs. v. Fla. Nat'l Univ., Inc.*, 830 F.3d at 1264.  Like the other factors, the Plaintiff has not provided any evidence of actual confusion. The Plaintiff cannot demonstrate any actual confusion between IMP's goods and services and Plaintiff's goods and services because the Plaintiff is not currently offering any services or selling any products to consumers.

Given the foregoing analysis, the Plaintiff is not likely to prevail on the merits of its trademark infringement claim.

**(h) IMP's Use is a Fair Use**

"[O]ne can use another's mark truthfully to identify another's goods or services in order to describe or compare its product to the markholder's product." *MPS Entm't, LLC v. Abercrombie & Fitch Stores, Inc.*, 2013 U.S. Dist. LEXIS 91193, *43, 110 U.S.P.Q.2D (BNA)

16

1287, 1298-1299, 2013 WL 3288039 (S.D. Fla. 2013) quoting *Pebble Beach Co. v. Tour 18 I Ltd.*, 155 F.3d 526, 545 (5th Cir. 1998).  In this case the Plaintiff's alleged product is the Menudo Band. IMP is promoting and providing live musical entertainment featuring former members of the Menudo Band. In other words, IMP is truthfully identifying its live entertainment as former members of the Menudo Band, and is entitled to a fair use accordingly.

**3. False Designation of Origin Claim and Passing Off Claim under 1125(a) fails for same reason Plaintiff's Claim for Trademark Infringement fails.**

The test for liability for false designation of origin under 15 U.S.C. § 1125(a) is the same as for a trademark infringement claim. *See Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 780 (1992). Thus, the Plaintiff does not have a substantial likelihood of prevailing on claims for false designation and passing off.

**4. The Plaintiff Has Alleged No Dilution Claim.**

"To prove a dilution claim, a plaintiff must provide sufficient evidence that (1) its mark is famous; (2) the defendant adopted its mark after the plaintiff's mark became famous; (3) the defendant's mark diluted the plaintiff's mark; and (4) the defendant's use is commercial and in commerce." *Carnival Corp. v. SeaEscape Casino Cruises, Inc.*, 74 F. Supp. 2d 1261, 1269 (S.D. Fla. 1999).

The Plaintiff's complaint contains no claim for dilution. The bottom line is the Plaintiff has not plead any claim based on the theory of dilution and is thus not entitled to an injunction on this claim.  *See, e.g., Automated Transaction Corp. v. Bill Me Later, Inc.*, 2010 U.S. Dist. LEXIS 46101 (S.D. Fla. 2010).

**B. No Irreparable Injury**

To obtain a preliminary injunction the Plaintiff must show that it will suffer ***imminent*** irreparable harm unless the injunction issues. *See Wreal, LLC v. Amazon.com* 840 F.3d 1244,

1248 (11th Cir. 2016). "Even if Plaintiffs establish a likelihood of success on the merits, the absence of a substantial likelihood of irreparable injury would, standing alone, make preliminary injunctive relief improper." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000). "Indeed, the very idea of a *preliminary* injunction is premised on the need for speedy and urgent action to protect a plaintiff's rights before a case can be resolved on its merits." *Id.* For this reason, our sister circuits and district courts within this Circuit and elsewhere have found that a party's failure to act with speed or urgency in moving for a preliminary injunction necessarily undermines a finding of irreparable harm. *See, e.g., Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985); *Taylor v. Biglari*, 971 F. Supp. 2d 847, 853 (S.D. Ind. 2013) (citing *Shaffer v. Globe Protection, Inc.*, 721 F.2d 1121, 1123 (7th Cir. 1983)); *Silber v. Barbara's Bakery, Inc.*, 950 F. Supp. 2d 432, 439-40 (E.D.N.Y. 2013); *Hi-Tech Pharms., Inc. v. Herbal Health Prods.*, Inc., 311 F. Supp. 2d 1353, 1357-58 (N.D. Ga. 2004); *Seiko Kabushiki Kaisha v. Swiss Watch Int'l, Inc.*, 188 F. Supp. 2d 1350, 1355-56 (S.D. Fla. 2002); *Wreal, LLC,* 840 F.3d at 1248.

As demonstrated by the Plaintiff's Exhibit C, the Plaintiff (or the Plaintiff's alleged predecessor in interest) knew about IMP and Ms. Bruan's use of its MENUDO MANIA Marks dating back to August 2015. Thereafter, and with permission to use the MENUDO trademark from the Plaintiff's alleged predecessor in interest, IMP began the MENUDOMANIA FOREVER Tour. The Tour garnered national press coverage. On May 2, 2016 the Plaintiff sent a cease and desist letter, alleging the complained of actions for the first time. *See* Pl. Ex. C. at p. 2. On January 19, 2017, IMP filed an opposition with the Trademark Trial and Appeal Board to the registration by the Plaintiff of MENUDO and on March 28, 2017 IMP filed a petition to cancel the Plaintiff's registered MENUDO trademark. On April 26, 2017, over a year later, the Plaintiff

filed its Complaint and its trademark counsel emailed counsel for IMP a copy. On June 5, 2017 IMP filed its Answer to the Complaint, Affirmative Defenses and Counterclaims.

On June 16, 2016, ***nearly two years after learning of IMP's use of the mark at issue***, the Plaintiff requested the drastic remedy of injunctive relief for the first time**.** In other words, the Plaintiff *knew* about IMP's activities for nearly 2 years before seeking any expedited judicial relief.  The Plaintiff has shown no urgency or necessity for an injunction at this late juncture. The Plaintiff's failure to act with any speed or urgency in moving for this preliminary injunction completely undermines any possible finding of irreparable harm.  To that end, and based on this prong of the analysis alone, the Plaintiff's Motion must be denied.  *See e.g. Wreal, LLC,* 840 F.3d at 1248 (11th Circuit holding that a delay of five months undermines any claim of imminent irreparable harm).

### C.  The Issuance of An Injunction Will Cause Defendants Substantial Imminent and Irreparable Harm.

It is the Plaintiff's burden to show that the threatened injury to the Plaintiff by IMP's continued activities outweighs whatever damage the injunction may cause to IMP.  The Plaintiff claims that "the reputation and goodwill associated with Menudo and Plaintiff's Mark" will be damaged if IMP is not enjoined. *See* Dkt. 16, p. 12. First, it is unclear what, if any, reputation or goodwill belongs to the Plaintiff with respect to the Menudo brand; it has never used the mark. Second, it is unclear how IMP's activities, promoting and building up excitement for the reintroduction of Menudo would in any way harm the Plaintiff. In fact, it will likely assist the Plaintiff in gaining traction if it ultimately wishes to use the MENUDO mark in some lawful way in the future.  Finally, the Plaintiff has "co-existed" with IMP since 2015 without suffering any harm and there is no evidence that any harm would emerge or amplify during the pendency of this litigation.

On the other hand, an injunction will cause IMP substantial harm. *See* CB Dec at ¶¶ 53-55. IMP has and continues to expend significant time, energy and sums of money developing its MENUDO MANIA Tour and reunion shows featuring former Menudo Band members. *Id.* at ¶¶35, 54. Currently, IMP is planning a tour to feature former members of Menudo with the Jacksons (formerly the Jackson 5) through Live Nation. *Id.* at ¶54. IMP would be precluded from using the MENUDO Mark fairly to identify the talent it is presenting on tour as being members of the Menudo Band. The tour and IMP's efforts in general employ many hard working musicians, crew, and staff. *Id.* at ¶36. Enjoining them from using the name that they have lawfully been using – and a name that helps them earn a living – would be inequitable. *Id.* at ¶55. In balancing the harms, real and actual harm would immediately be felt by IMP whereas the Plaintiff would not suffer any harm.

### D.  An Injunction Is Against The Public Interest

The Menudo Band "disbanded" in 2009. It was not until IMP brought back the beloved members of the band that Menudo returned to entertain its fans, many of which reside in this District. To enjoin IMP would be to deprive the public of exposure to valued, enriching and multinational art and cultural entertainment. It is in the public's interest to allow IMP to proceed with entertaining fans of all ages.

### V. Bond

A $3,000 bond is wholly insufficient to cover the costs and damages that will be sustained by IMP should it later be determined they were wrongfully enjoined. If an injunction is to issue IMP requests that Plaintiff be required to place a bond for at least $1,035,000.00, the approximate financial loss IMP will suffer because it will have had to cancel its imminent tours and be unable to continue touring.  *See* CB Dec at ¶ 54.

WHEREFORE, IMP and Ms. Bruan seek entry of an order denying the motion for preliminary injunction, and any other relief this Court deems just and proper.

Respectfully Submitted,
/s/ Vivek Jayaram

Vivek Jayaram
Johanna Hyman
Jayaram Law Group, Ltd.
125 S. Clark Street, 17th Floor
Chicago, IL 60603
646-325-9855
Email: vivek@jayaramlaw.com
Email: Johanna@jayaramlaw.com
Counsel for In Miami Productions LLC and Maria Cristina Bruan
Admitted Pro Hac Vice

Joshua Alhalel
Alhalel Law
777 Brickell Avenue, Suite 600
Miami, FL 33131
305-563-9060
Email: josh@alhalel-law.com
Local Counsel

## CERTIFICATE OF SERVICE

I, Joshua Alhalel, hereby certify that on June 30, 2017, I filed Defendants' Response to

Plaintiff's Motion for Preliminary Injunction by using the Court's CM/ECF electronic filing

service, which will serve all attorneys of record accordingly:

**Richard Charles Wolfe**
Wolfe Law Miami, P.A.
175 SW 7 Street
Suite 2410
Miami, FL 33130
305-384-7370
Fax: 305-384-7371
Email: rwolfe@wolfelawmiami.com

/s/ Joshua Ryan Alhalel
Joshua Alhalel
Alhalel Law
777 Brickell Avenue, Suite 600
Miami, FL 33131
305-563-9060
Email: josh@alhalel-law.com


Vivek Jayaram
Johanna Hyman
Jayaram Law Group, Ltd.
125 S. Clark Street, 17th Floor
Chicago, IL 60603
646-325-9855
Email: vivek@jayaramlaw.com
Email: Johanna@jayaramlaw.com
Admitted Pro Hac Vice
