# MERCHANDISING AND FAN MANAGEMENT AGREEMENT

THIS AGREEMENT, dated as of April 1, 2008 (the "Effective Date"), by and between Paid, Inc. ("PAID"), a Delaware corporation located at 236 Huntington Avenue, Boston, Massachusetts 02115, and Menudo Entertainment, LLC, a New York limited liability company located at 583 City Island Avenue, Bronx, NY 10464 ("Licensor") with respect to the artist Menudo ("Artist") is being entered into for the purpose of Licensor's exclusive licensing rights worldwide to the following: (i) Artist's official internet fan website ("Website"); (ii) Artist's official fan club; (iii) Artist's merchandise supply and sales; and (iv) other promotional sales, including Artist ticketing packages, fan experiences, travel packages, and mobile fan club, as well as non-exclusive rights to additional advertising and sponsorship activities.

Now, in consideration for the mutual benefits, agreement and covenants contained in this Agreement, the parties agree as follows:

1. ARTIST OFFICIAL INTERNET FAN WEBSITE SERVICES

    A. Hosting of the Website

    Licensor hereby grants to PAID, for the purposes and with the intent of this Agreement, throughout the Term of this Agreement: (i) the exclusive right and license worldwide to operate the only official Website authorized by Licensor and/or the Artist; (ii) the right to use any of Licensor's trademarks, service marks and/or Artist's name, approved likeness and approved biography (including the names, likeness and biographies of Artist's members, including former members); and (iii) the right to sell Merchandise, Fan Club Memberships, Ticketing Packages, Fan Experiences, Travel Packages, Artist One of a Kind Collectibles and Memorabilia (each as defined in this Agreement) and any other agreed upon service or product through the Website. During the Term of this Agreement, Licensor shall not authorize any other website to identify itself as the "official" or "authorized" (or any other similar term) website of the Artist or otherwise sponsor or authorize any other website with respect to the Artist.

    The Website shall provide online distribution access of Artist sponsored products, materials, content, service and fan club Merchandise. PAID will assume, administer, further advance, maintain, design, host and operate the Website, currently addressed at www.menudoworld.com. PAID will further design and develop the Website, including with respect to the source code, the sale of Merchandise, and the commerce system. Licensor shall have the right to approve the general "look and feel" and general content of the Website. PAID shall build the Website to have similar functionality as that of the Website prior to the Effective Date, with any additional technology that PAID determines to use or in the future will use to improve the Website. PAID shall provide all necessary credit card, accounting and processing services and develop payment, delivery and refund policies to fulfill service and product orders through the Website. Licensor authorizes PAID to include a link to the Website through PAID's other portals.

    B. Ownership of Website

    PAID acknowledges and agrees that Licensor owns all rights in and to the URL for the Website. In the event certain controls and access to the Website are granted to PAID during the Term of this Agreement to fulfill PAID's obligations hereunder, then upon termination of this Agreement the control and access to the Website shall automatically revert back to Licensor.

2. ARTIST OFFICIAL FAN CLUB SERVICES

During the Term of this Agreement, PAID shall have the exclusive right to create, operate, and maintain Artist's official fan club ("Fan Club"). The Fan Club shall be further defined as the only fan club or organization created and maintained under the direction of Licensor and/or Artist or that acts as a member's only community by selling memberships to a club or organization ("Fan Club Memberships") with respect to the Artist. Licensor shall negotiate with Ticketmaster on a best efforts basis to authorize an additional $1.00 fee per Concert ticket paid by the purchaser for delivery and payment to the Fan Club as consideration for automatic membership into the Fan Club, whereby all such purchasers shall receive a coupon right for online Merchandise. PAID shall have the right to sell, advertise, promote and market the Fan Club and its services, Merchandise and other products by any means now known or hereinafter devised that are identified with and controlled directly by the Fan Club and/or PAID, including, but not limited to, direct mail, online promotion and sales efforts, and event promotion and marketing efforts. PAID shall provide the following types of core services for the Fan Club, subject to the terms of this Agreement:

A. Develop and manage the Fan Club, subject to the general oversight and direction of Licensor;

B. Collect and manage the revenue and costs of membership sales ("Membership Sales");

C. Create and reach out to mobile markets and create a Mobile Fan Club membership level;

D. Create and fulfill a Fan Club Membership Package, with pricing and package contents to be mutually agreed upon;

E. Screen & respond to Fan Club e-mails;

F. Provide customer service support for Fan Club questions;

G. Host a hotline for fans to obtain announcements about Tour schedule, contests, and special promotions;

H. Maintain a current database;

I. On a case-by-case basis, create marketing initiatives for sponsorship of the Fan Club and cross promote with Artist's and Licensor's other business associations, subject to a case-by-case approval by Licensor over the types of sponsorship activities being pursued, it being understood and agreed that the approval of any sponsorship activity may be withheld by Licensor in its sole discretion;

J. Promote and market the Fan Club through cross-promotions with PAID contacts, subject to Licensor's approval; and

K. Activate fans to increase Fan Club membership through activities which may include, but not be limited to, e-mail blasts and newsletters to Fan Club, Artist's label, and related Artist databases; online seeding activities, contests, and promotions; renewal reminders to current members; Refer-a-Friend programs; on-site membership acquisition through VIP parties and fliers; and special offers with purchase of membership.

3. ARTIST MERCHANDISE SUPPLY AND SALES

A. Merchandise

PAID shall have the exclusive licensing rights worldwide to design, market and sell Licensor's and/or Artist's official merchandise ("Merchandise"), together with, but not limited to, tour and Fan Club Merchandise onsite at venues servicing Artist's tour ("Tour"), at retail and wholesale, via mobile phones and other devices, and through the Website, including at "mass retail" (i.e., Target, Wal-Mart, Kmart, and Kohl's). Merchandise shall include, but not be limited to, clothing, caps, jewelry, photos, specialty items, proprietary items, collectable items, memorabilia and special or limited edition items, and special bundled packages including any or all of the foregoing items designed, sourced, manufactured and/or purchased by PAID. Licensor shall have the right of approval over each piece of Merchandise, which approval shall not be unreasonably withheld. Pricing of Merchandise shall be as reasonably agreed by the parties consistent with customary practices in the music merchandising business. All CDs or other pre-recorded product(s) sold through PAID or any sublicensee of PAID shall be subject to the rights of Artist's label and publisher, if any. PAID shall have the sole and exclusive right to license or sublicense to third parties and act as agent for the direct licensing between Licensor and/or Artist and third parties for the development, manufacture and distribution of approved Merchandise.

Licensor hereby grants to PAID the exclusive licensing rights worldwide to market and sell Artist's collectibles and memorabilia, including autographed items, one-of-a-kind and/or limited edition items ("One of a Kind Collectibles and Memorabilia"), authenticated by PAID, including, as appropriate, unique bar code and tamper proof holograms with online verification.

The Merchandise shall at all times be of high quality in content and workmanship consistent with customary practices in the music merchandising business and will conform to samples approved by Licensor with respect to style, appearance and quality. PAID shall print, stamp or mold the copyright and/or trademark notice (and any other applicable notices/credits) designated by Licensor on all Merchandise and on each package or container used in connection with the Merchandise, all in accordance with commercially reasonable instructions from Licensor (including as to position and size).

To facilitate the readiness of Merchandise for distribution, Licensor grants to PAID the right to go to production and distribution based on Licensor's or Artist's approval of paper comps provided by PAID's creative department and without the delivery of pre-production samples. Any designs and/or Merchandise (including pricing) that has been previously approved by Licensor through other licensees (or, pursuant to Section 7.A. under this Agreement), shall be deemed approved by Licensor and Artist and licensed to PAID for purposes of this Agreement. Promptly upon execution of this Agreement, Licensor shall provide to PAID copies of all executed prototype and approved Merchandise product forms, inclusive of designs and manufacturer and a list of all Merchandise licensees and licenses.

Neither Licensor nor Artist shall permit any Merchandise or products of any type, other an non-souvenir consumables (i.e., food, beverages and tobacco) to be authorized for sale by Licensor or Artist, sold or otherwise distributed in and about any Concert Venue for Artist Tours during the Term of this Agreement, except by PAID or its designees. In accordance with the foregoing, Licensor and Artist shall use commercially reasonable efforts to arrange with each Venue the right for PAID to distribute merchandise and product typically sold at live performances whether or not relating to Artist or bearing the Artist's marks and materials.

Licensor grants to PAID the right for PAID to work with Artist's individual band members to sell personal items of the band members on the Website or on the Artist's band member's

personal website or through auction houses at the percentages agreed upon by PAID and the individual band member.

B. Sales

PAID shall provide all necessary credit card, accounting and processing services and develop payment, delivery and refund policies to fulfill all orders of Merchandise to online customers. PAID hereby warrants that all credit card information and/or other information collected by PAID hereunder shall be maintained using an industry standard commercially available level of security, and will not be shared with or accessible to any unauthorized person or entity.

C. Launch Party/Press Conference.

Licensor shall ensure that each of the five Artist band members attend and participate in a launch party held by PAID at a reasonable time upon reasonable notice for the purpose of the launch of the Artist's Merchandise line.

D. Infringement

Licensor and PAID shall cooperate to ensure that third parties may not unlawfully infringe on or imitate the Merchandise or engage in any acts of unfair competition involving the Merchandise. Each party shall promptly notify the other of any such infringements, imitations, or acts by third parties that comes to its attention. Licensor retains the right to prosecute such proceedings in its own behalf and at its sole expense (and may grant PAID, upon PAID's request, the right to prosecute such proceedings). No claim or action instituted by either party shall be settled without the approval of the other party, which approval shall not be unreasonably withheld or denied. PAID shall work with Licensor and Artist to police infringers by taking such actions as PAID may deem prudent or necessary, including without limitation, writing cease and desist letters, and coordinating other anti-infringement strategies and actions with Licensor. PAID may seek injunctions, in its sole discretion, authorizing the seizure of unauthorized Merchandise bearing the Artist's marks and retain security to combat bootlegging at live performances (i.e., so-called "bootleg injunctions"). Eighty percent (80%) of the costs and expenses of such actions shall, at PAID's sole election, be (i) treated as an additional advance hereunder, (ii) offset immediately against payments owed to Licensor, or (iii) paid by Licensor within thirty (30) days after receipt of PAID's invoice therefor, with the remaining twenty percent (20%) of such costs and expenses to be borne by PAID.

4. OTHER PROMOTIONAL SALES

A. Ticketing Packages

Licensor hereby grants to PAID the exclusive right during the Term of this Agreement to sell and administer special Concert VIP ticket packages for concerts to be held worldwide prior to and during public on-sale dates, and manage preferred seating, VIP ticketing and other perks for Fan Club members through the Website and other opt-in fan databases of Licensor and/or Artist at Concert Venues and other Artist-approved appearances ("Ticketing Packages"). PAID shall sell, pick, pack, ship or leave at will call Ticketing Packages that include mutually agreed upon benefits. Licensor shall provide VIP tickets on a best efforts basis for each Concert and other appearance, available pre-sale at least two weeks prior to public sale on a continuing basis through each Concert date, so that at least, on a best efforts basis, ten percent (10%), or more as agreed by Ticketmaster (or like companies), of the tickets for each Concert are made available for pre-sale through the Official Website. For larger headline venues, such tickets shall be for premium seats evenly distributed in the front fifty (50) rows, the wings,

and the P1 (floor) inventory. For example, tickets may be in every other row, starting with event rows 2 through 50, with additional coverage from wings (odd or even rows), with remainder P1 (floor) inventory. In the event that the area is less traditional without assigned seating, VIP tickets will be for standing room or seated velvet ropes section. In the event that the Artist is not the headlining act, then Licensor shall use its best efforts to provide VIP tickets at least two weeks prior to public sale to certain premium roped off areas.

    B.  Fan Experiences

Licensor hereby grants to PAID the exclusive right during the Term of this Agreement to sell and manage fan experience packages worldwide to include mutually agreed upon benefits (i.e., tickets in first few rows of venue, backstage tour, meet & greet with Artist ("Meet and Greet"), parties, and other similar experiences) ("Fan Experiences"). Licensor authorizes the sale of Fan Experiences on sale through the Website, Fan Club and any agreed upon third party marketing partner prior to tickets going on sale to the general public. The parties to this Agreement shall mutually agree upon the price per person, location, and the number sold to each purchaser prior to each Concert Tour, provided that no more than 40-50 Meet and Greet packages may be sold for any particular Concert without the prior consent of Licensor. PAID shall insure that Meet and Greet events are limited to no more than twenty-five (25) minutes in length, held in a segregated area, one autograph per attendee, with reasonable security, with no cell phones or cameras permitted other than PAID photography. Licensor shall ensure that at least four out of five of the band members will participate in each Meet and Greet on a rotational basis, so that at a minimum each band member participates in four out of every five Meet and Greet events.

    C.  Travel Packages

Licensor hereby grants to PAID the exclusive right during the Term of this Agreement worldwide to sell and manage travel packages through the Website, Fan Club and any agreed upon third party marketing partner for Artist's Concert Tours and other special events, to include mutually agreed upon benefits (i.e., lodging near venue, bus transportation, party, Fan Experiences) ("Travel Packages").

    D.  Mobile Fan Club

Licensor hereby grants to PAID the exclusive right during the Term of this Agreement to manage and market Artist's mobile fan club ("Mobile Fan Club") worldwide. PAID may provide a mobile phone extension of the Fan Club through e-commerce, promotions and services on behalf of Artist, including but not limited to: downloads; alerts and updates; ticket pre-sales; contests; memberships, exclusive text messages; and Fan Club Merchandise, but expressly excluding music rights, ring tones, and artwork or images not controlled by Licensor or Artist.

    E.  Advertising and Sponsorship

Licensor hereby grants to PAID the non-exclusive right during the Term of this Agreement to offer advertising and sponsorship opportunities to third parties related solely to Website and Fan Club initiatives or as otherwise agreed. PAID understands and agrees that other third parties are selling advertising and sponsorship on behalf of Artist's initiatives. PAID and Licensor shall confer with one another prior to initiating contact with any sponsor. PAID will notify and confer with Licensor with regard to the category of the goods and services that would be associated with the proposed sponsorship and the identity of any potential sponsor that PAID proposes to solicit with respect to such category of goods or services. PAID shall not be entitled to any participation in sponsorship activities that a third

party secures unrelated to the services that PAID is performing under this Agreement unless otherwise agreed to by the parties. Licensor shall have the right of approval over each of these relationships, and such approvals may be withheld in Licensor's sole discretion.

F. Other Promotional Sales.

The parties may agree from time to time to the exclusive and nonexclusive right to offer other promotional sales. The extent that a party desires to provide other promotional sales, such party shall notify the other party or its primary designee to initiate discussions. No party is obligated to agree to such other promotional sale if such promotional sale is not already set forth in this Agreement.

5. ADVANCE

A. Advance Payment

PAID will pay to Licensor and Artist a recoupable advance of Two Hundred Thousand Dollars ($200,000), as an advance against monies to be earned by Licensor under this Agreement (the "Advance"), which Advance shall be paid as follows:

(i) $100,000 within 30 days (of which the first $100,000 will be delivered within 30 days) after the later of execution of this Agreement, delivery of all necessary artwork, and approval of public release of pre-approved joint press release in the form provided at execution of this Agreement, which may be paid in cash or options representing freely tradable common stock of PAID through an immediately exerciseable stock option, in the sole discretion of PAID, which option shall be valued at $100,000 (less any cash actually paid) based on the fair market value of the stock as of the date of issuance less any exercise price required by the stock option, it being understood that PAID shall guarantee such fair market value of the stock for a period of 30 days from the date of issuance if the individual holder provides all required broker paperwork to sell the stock to his broker within such 30-day period and notifies PAID of such intent to sell along with the name of the broker and number of shares to be sold, and it is further understood that options are delivered directly to individual holder of the Licensor and not to Licensor based on the pro rata share directed by Licensor;

(ii) $100,000 within 60 days (of which the first $100,000 will be delivered within 30 days) after the later of execution of this Agreement, delivery of all necessary artwork, and approval of public release of pre-approved joint press release in the form provided at execution of this Agreement, which may be paid in cash or options representing freely tradable common stock of PAID through an immediately exerciseable stock option, in the sole discretion of PAID, which option shall be valued at $100,000 (less any cash actually paid) based on the fair market value of the stock as of the date of issuance less any exercise price required by the stock option, it being understood that PAID shall guarantee such fair market value of the stock for a period of 30 days from the date of issuance if the individual holder provides all required broker paperwork to sell the stock to his broker within such 30-day period and notifies PAID of such intent to sell along with the name of the broker and number of shares to be sold, and it is further understood that options are delivered directly to individual holder of the Licensor and not to Licensor based on the pro rata share directed by Licensor.

Licensor, directly and on behalf of Artist, may prepay any Advance payment at any time. In the event that PAID delivers cash in lieu of stock, the guarantee of the fair market value of the common stock shall be for the amount of payment required as part of the Advance payment less the cash amount actually paid.

For purposes of this Agreement, "Qualified Attendees" shall mean those individuals who have paid a full, separate admission price for a ticket to a Concert, and who have actually attended such performance, as verified by the Venue's count.

For purposes of this Agreement, "Concert" shall mean a live musical concert of at least 45 minutes, given by Artist as the sole headliner or co-headliner, in a Venue with a capacity of no fewer than 1,500 people, which Concert is not given in conjunction with another non-musical public performance, fair or amusement event, unless a separate admission is charged for such Concert, and at which PAID is responsible for the sale, and has the right to sell, the Merchandise to the public in attendance.

For purposes of this Agreement, "Venue" means the location (e.g., theatre, arena, stadium, music hall, nightclub and the like) of Artist's live performances.

B. Repayment

(i) In the event that a Tour is not announced and Ticketing Packages are not available for sale on the Website by April 1, 2008, or the Tour is not initiated by May 1, 2008, or in the event that any member of the Artist announces his retirement, is dropped by the Artist's record label, dies or incurs an injury, illness or similar incapacity which will render him or her unable to perform at a scheduled performance for more than one hundred twenty (120) days thereafter, PAID shall have the right to demand repayment, at which time Licensor shall immediately pay to PAID all unrecouped sums and other amounts payable to PAID pursuant to this Agreement.

(ii) Upon the cancellation (and not the mere postponement) of a Tour by Artist, at any time and for any reason, PAID shall have the right to demand repayment of all or any portion of the unrecouped Advance and, any other amounts payable by Artist pursuant to this Agreement, at which time Licensor shall immediately pay to PAID all unrecouped sums and other amounts payable to PAID pursuant to this Agreement. For purposes hereof, any postponement of touring that is not rescheduled to a date that is no later than one hundred twenty (120) days following the first postponed performance may, at PAID's discretion, be deemed a cancellation.

(iii) In the event a Tour or Tour leg by Artist is postponed and is not rescheduled within ten (10) business days after the date of the cancellation to a date that is one hundred twenty (120) days or fewer from the first postponed dates, or postponed and rescheduled as described above, but does not actually commence on the new scheduled recommencement date, or postponed for a duration on more than two occasions, then PAID shall have the right to demand repayment of all Advances and any other amounts payable by Artist under this Agreement, at which time Licensor shall immediately pay to PAID all unrecouped sums and other amounts payable to PAID pursuant to this Agreement.

(iv) In the event there is a gap of more the one hundred fifty (150) days between Tour or Tour cycles during the Term of this Agreement, PAID shall have the right to charge interest on the unrecouped balance of the Advance at the higher of 5% per annum or the "prime rate" established by the Wall Street Journal from the date of the Artist's last Qualifying Performance until Artist's resumption of touring. If there is a gap of more than one hundred fifty (150) days between Tour or Tour cycles during the Term of this Agreement, PAID shall have the right to demand repayment of all or any portion of the unrecouped balance of the Advance, plus interest calculated in accordance herein.

(v) All amounts due by Licensor under this Agreement, shall be paid within ten (10) business days of PAID's delivery of a written request or invoice for such amount due.

(vi) If PAID remains unrecouped as to the entire outstanding balance of the Advance after any partial repayment of the unrecouped balance to PAID by Licensor, the Term will be tolled for the duration of the postponement and shall continue for the remainder of the Term plus the tolled period.

C. Recoupment

Licensor understands and agrees that PAID is entitled to deduct, set off and recoup (a) all Advances, guarantees and deposits paid to Licensor and (b) any other unpaid amounts payable by Licensor under this Agreement (e.g., unpaid invoices for Merchandise purchases by Licensor and/or the Artist) against monies and Advances payable by PAID to Licensor under this Agreement, including the profit percentage payments described in Section 6 of this Agreement.

D. Performance Minimum

From the date of commencement of this Agreement and through each Tour, Artist shall perform before no fewer than 50,000 Qualified Attendees (the "Performance Minimum"). If the Performance Minimum has not been satisfied in full by the end of each Tour for any reason, PAID may at its election request, and Licensor shall repay to PAID (and/or shall cause Artist to repay to PAID), a pro rata portion of the Advance equal to the number of actual Qualified Attendees during the Tour divided by 50,000, and then multiplied by the amount of the Advance paid to Licensor and/or Artist.

6. PROFIT SPLITS

A. Merchandise Sold at Retail and at Concert Venues.

PAID shall pay to Licensor an amount equal to Seventy Percent (70%) of Gross Sales from all Merchandise sold at Concert Venues and at Retail. For purposes of this Agreement, "Gross Sales" shall mean all money actually collected by PAID or credited to PAID's account in connection with the sale of applicable Merchandise, less any applicable sales taxes, value added taxes, or other equivalent, including any applicable import taxes or duties, or chargebacks or returns. Licensor shall be solely responsible for payment of all hall and vend fees, including credit card fees and hall security fees (collectively "Hall and Vend Fees"), artwork design and costs, road costs for one to three (as necessary) individuals (excluding labor costs, but including travel/transportation, hotel and food (or standard Artist per diem)), and Merchandise transportation to Venues. In addition to other costs, PAID shall be responsible for payment of the costs of goods sold at Concert Venues. In the event that PAID pays any fee or cost that Licensor is obligated to pay under this Agreement, PAID will request such payment from Licensor or in its discretion deduct such payment amount from the percentage of Gross Sales payable to Licensor. From time to time PAID and Licensor may agree that certain One of a Kind Collectibles and Memorabilia may be sold at Concert Venues as agreed by the parties, which One of a Kind Collectibles and Memorabilia will be sold on a 50/50 Net Profits basis in the same manner as Merchandise sold online, provided that the parties can negotiate lower Hall and Vend Fees solely with respect to such One of a Kind Collectibles and Memorabilia. In the event that Licensor or Artist holds any pre-existing Tour Merchandise before the Effective Date, Licensor shall give PAID the opportunity to purchase such Merchandise at Licensor's cost.

B. Membership, Online Merchandise, Ticketing Packages, Travel Package, Fan Experiences, and Mobile Fan Club Sales

Except as otherwise set forth in this Section 6, Licensor shall receive fifty percent (50%) of all Net Profits (as described in this Section 6) from Website sales, Membership Sales, Online

Merchandise, Fan Experience Sales, Ticketing Packages, Travel Package Sales and Mobile Fan Club Sales.

C. One of a Kind Collectibles and Memorabilia.

Licensor shall receive the following percentages of all Net Profits with respect to such sale of One of a Kind Collectibles and Memorabilia (as defined in Section 3.A. of this Agreement), which percentage varies based on the purchase price paid by a buyer and received by PAID for such item:

| Price | Percentage |
|---|---|
| $5000+: | 85% |
| $2500-4999: | 82% |
| $1000-2499: | 80% |
| $750-999: | 75% |
| $500-749: | 70% |
| $250-499: | 60% |
| $1-249: | 50% |

D. Charities

PAID will pay to the subject charity, or to Licensor, for payment to the subject charity, 100% of all Net Profits from sales with respect to any charitable event or benefit which is advertised as a charitable event, and held for and dedicated to such chartable organization.

E. Net Profits

For purposes of this Agreement (including this Section 6), "Net Profits" shall be defined as the gross revenues actually received or credited by PAID through all sales of Fan Club Memberships, online and mobile sales of Merchandise (i.e., excluding Merchandise sold at Concert Venues or at Retail in stores, but including One of a Kind Collectibles and Memorabilia), Ticket Packages, Fan Experiences and Travel Package sales, and as agreed other promotional sales, less "Expenses." For purposes of this Section, "Expenses" shall be defined as all actual direct out-of-pocket non-overhead costs of goods (no general overhead costs shall be deducted), manufacturing, production, reproduction, post-production, creation and/or sourcing of marketing packages, cost of Fan Club Membership Packages, promotional giveaways and merchandise; any Licensor pre-approved marketing costs including Internet seeding campaigns using third party databases, third party marketing and agency commissions, e-mail blasts, and venue membership drives; in-bound freight charges; postage; shipping and handling charges that are not passed on to the purchaser; third party fulfillment fees; specific out-of-pocket costs associated with servicing the Fan Club and Website, including Licensor approved specific Artist online marketing company and technical licenses for the Website; warehouse, storage, and shipment fees; any credits for cancellations, returns, chargebacks, and inventory write-offs and obsolescence charges; credit card processing fees; and sales, use, entertainment and value-added taxes. PAID shall use best efforts to keep all Expenses at the lowest as is commercially reasonable. PAID shall provide Licensor the approximate Expenses of each component to the Fan Club Membership Package, Merchandise, Fan Experiences, Ticketing Packages, Travel Packages, Mobile Fan Club, and other promotional sales prior to public sale.

7. LICENSOR SERVICES

Licensor shall render the following (whether directly, through the Artist and its members, or personally through its designated representatives) to PAID:

A. Approval

Licensor shall exercise all approval rights under this Agreement, including, without limitation, approvals as to artwork and Merchandise samples, website design, in good faith and not in a manner calculated to undermine the purposes of this Agreement or prevent PAID from recouping the Advance or to maximize revenue. Licensor shall be readily available for approvals of Merchandise, Website designs, press releases and other needed approvals per this Agreement on a timely basis in order to effectively maximize sales. Approval shall be deemed given automatically if a response is not rendered within fourteen (14) days after delivering the respective item or matter to be approved. Licensor hereby designates Seth Goldberg (or his designee named in writing delivered to PAID) as its point person for purposes of granting approvals. Licensor may change the designee to another point person upon notice given not more than fourteen (14) days prior to such change.

B. Information

Licensor shall use its best efforts to provide PAID with accurate and timely information regarding Artist's activities, including, but not limited to, CD releases, books, videos, contests, partnerships, public appearances, and promotional ties and activities and designate a point person from whom PAID shall be authorized to receive timely information about Artist.

C. Website URL and Fan Club Information Inclusion

Licensor shall use its best efforts to facilitate permission for distribution of Website URL and Fan Club information at events and use commercially reasonable efforts to include Fan Club addresses (physical and electronic) and URL and Fan Club contact information on Artist related CDs, merchandise, videos, programs, on-site banners, affiliated websites, videos, television programming, films, and/or other Artist related products.

D. Online Cross Promotion

Licensor shall use its best efforts to feature prominently, and hyperlink to the Website with, any third party Artist focused online events (i.e., live chats or streaming events).

E. Materials

Licensor shall supply PAID with sufficient quantities and appropriate types of approved, cleared, reproducible photographs, graphics, logos, biographies, designs, materials, album artwork and titles, titles and lyrics of songs written or co- written by Artist and other artwork embodying Artist's marks and materials ("Artist Artwork"), all at Artist's sole cost and expense. Licensor shall deliver Artist Artwork either as originals, first generation duplicate transparencies, or electronic files no smaller than 50mb. Licensor understands and agrees that certain monies are being advanced by PAID to Licensor pursuant to this Agreement with the understanding that the timely delivery of Artist Artwork is a condition precedent to PAID's ability to fulfill its obligations hereunder.

F. Meetings

Licensor shall provide a representative(s) to meet at mutually agreed upon times to discuss content and other creative aspects related to Website, Fan Club, Merchandise, Ticketing Packages, Travel Packages, Fan Experience, and Mobile Fan Club offerings.

G. Lists/Databases

Subject to Licensor's and Artist's applicable privacy policy and Children's Online Privacy and Protection Act (COPPA) and other applicable statutory and regulatory requirements, Licensor shall share with PAID existing mailing lists and e-mail addresses of fans, customers and other contacts in electronic or other form reasonably requested by PAID that Licensor and/or Artist have collected, solely for PAID's use in connection with the fulfillment of its obligations under this Agreement. PAID shall not share any lists of data to any third party without the prior approval of Licensor. PAID shall comply with all applicable terms of Artist's and Licensor's privacy policies and COPPA and all other privacy statutes and regulations with respect to all data shared by Licensor. Licensor shall use its best efforts to provide PAID access to e-mail databases owned and controlled by Artist's label to facilitate e-mail marketing efforts specifically geared only to the Artist. PAID shall comply with all applicable terms of any and all record label privacy policy(ies) as provided to PAID either by the recording label(s) or Artist and COPPA and all other privacy statutes and regulations with respect to all data shared by the record label. Licensor agrees that the delivery of information will not be in violation of any law, regulation, policy or agreement.

H. Interviews and Meet & Greets

Licensor shall cause Artist's members to provide interviews at such reasonable times as can be scheduled with Artist for the Website and, subject to Artist's schedule and prior approval, PAID shall conduct Fan Club membership acquisition initiatives at Artist appearance venues. Licensor shall cause Artist to consider in good faith PAID's requests from time to time that Artist's members make personal appearances and participate in Meet & Greets in connection with such membership acquisition drives. Artist shall use reasonable efforts to grant Meet & Greets for Fan Experiences and Travel Packages. Licensor authorizes PAID to sell at least 40-50 Meet and Greet packages per Concert during each Tour. Licensor and PAID shall mutually agree upon the commercially reasonable price per person and the maximum number to be sold prior to each Concert Tour.

I. Tickets and Venues

Licensor shall contract with ticket promoters and Venues to offer preferred VIP seating for PAID to offer Ticketing Packages and Fan Experiences, and facilitate access to PAID representatives on site at Concert and event Venues to distribute membership information. Licensor shall cause Artist and Artist's management to be available at reasonable times and places for approval of the components for Fan Experiences and Travel Packages.

J. Delivery of Performance Schedule

As early as possible, but no later than thirty (30) days prior to the first performance, Artist shall deliver to PAID in writing (including an e-mail) a schedule of Artist's proposed performances, setting out in detail the date, city, Venue, contact at the Venue, capacity, as well as any agreements regarding merchandise fees to be charged by such Venues. Licensor shall promptly notify PAID in writing of any addition, postponement, rescheduling or cancellation of any performance. In the event such notice is not give at least five (5) days prior to a performance, PAID shall make reasonable efforts, but shall not be obligated to provide or sell Merchandise at an added or rescheduled performance. In the event a performance is postponed or canceled without at least five (5) days prior written notice, Licensor shall be liable to PAID for any and all reasonable out-of-pocket expenses incurred by PAID directly relating to PAID's preparation to sell Merchandise at such performance.

K. Ticket Sales Information

Artist understands and agrees that to maximize Tour Merchandise sales and enable PAID to efficiently gauge Merchandise requirements at Venues, Artist shall use best efforts to deliver to PAID on a daily basis once tickets go on sale, via e-mail, a current update of ticket sales for each Venue. For Concerts in which Artist is the headlining act, Licensor shall use best efforts to secure a minimum of ten percent (10%) of each Concert Venue's tickets for sale on the Website and any other third party marketer through PAID, with all seats being in the first fifty (50) (odd or even number seats), with additional tickets from the wings (odd or even rows) and "P1" (floor) inventory. Licensor shall use commercially reasonable efforts to ensure that all VIP tickets shall be available for sale twenty-one (21) days prior to tickets going on sale to the general public. Licensor and PAID shall mutually agree upon the price per person and the number sold to each purchaser prior to each Tour. Licensor shall grant other access rights for sale, such as rights to attend the sound check and VIP pre-parties.

L. Collectibles and Memorabilia

Licensor, either directly or through Artist, shall use best efforts to supply to PAID, at no cost to PAID, ahead of any announced Tour, and no later than April 15, 2008, a minimum of 250 Merchandise pieces autographed by all five band members. Licensor, either directly or through Artist, shall supply to PAID, at no cost to PAID, no later than ten (10) shows after the first Tour, an additional 450 Merchandise pieces autographed by all five band members, including by way of example Concert worn clothing, Concert used equipment, drumheads, set lists, photos, Tour laminates, posters, and other Tour related items reasonably approved by PAID. Paid shall have the right to set the price of each such item for sale through the Website, at Concerts and at retail, subject to the profit sharing arrangement for such method of sale as described in this Agreement, it being understood that for such items PAID shall not be responsible for paying for the cost of goods sold.

8. DATABASE INFORMATION

PAID shall, for the benefit of Licensor and/or Artist and upon transfer of Licensor's and/or Artist's current Fan database to PAID, maintain and update a database throughout the Term of this Agreement containing information about its users, including but not limited to names, addresses, e-mail addresses, and demographic, lifestyle and associated data, compiled from Fan Club activities ("Database"). The Database and all contents thereof shall be the property of Licensor and all contents thereof shall be made available to Licensor during the Term (upon request) and promptly after the Term. PAID shall comply with the privacy policy of the Fan Club in connection with the maintenance of the Database and collection of information in connection therewith. All of PAID's activities in connection with the Database shall be in full compliance with COPPA and all other applicable privacy laws and government regulations.

PAID shall provide Licensor with an updated copy of the Database for its own use upon receiving written request by Licensor's authorized representatives; provided such requests do not exceed once per thirty (30) days during the Term. The Database and all personally identifiable information contained therein is the sole property of Licensor. PAID may use all non-personally identifiable information contained in the Database only to the extent such use is agreed to by Licensor. Licensor may use the information contained in the Database for any purpose they desire consistent with its privacy policy, COPPA and other privacy regulations.

9. ACCOUNTING

PAID shall provide Licensor quarterly statements within thirty (30) days of the close of each calendar quarter on all sales during such calendar quarter except for Tour Merchandise as described below. Each statement of account shall include information on all revenues related to this Agreement, all

costs, deductions (including recoupment) and any sums due Licensor coupled with payment for any sums due.

Licensor shall have the right upon request to PAID, to review and examine, at Licensor's cost, the books, accounts, and records of PAID relating to Licensor's share of the revenue. The examination may be performed only within two (2) years after the date a statement is rendered, and not more than one (1) time per statement. Statements shall be final and binding upon Licensor, and not subject to any claim or objection by Licensor, unless PAID is notified by Licensor of Licensor's specific written objection to the applicable statement within two (2) years after the date the statement is delivered.

With respect to Tour Merchandise, PAID shall within twenty-four (24) hours after each Concert of series of Concerts at the same Venue, furnish Licensor with complete and accurate account of Merchandise distributed, taxes accrued, and fees paid for such Concerts. Licensor has the right to be present at all inventories, check-ins and the like, and at all Venues at which Merchandise is distributed. Licensor agrees that to the extent any Venue requires use of a third party concession company for the sale of Merchandise at Concerts, Licensor will use best efforts, whether by contract with the applicable Venue or otherwise, to ensure that the Venue pays Licensor all sums due PAID within five (5) business days after applicable Concert or series of Concerts at such Venue. PAID shall furnish Licensor with a summary statement within forty-five (45) days after the end of each Tour leg. Such statement will set forth in reasonable detail all sales figures (e.g., quality and price) and expenses associated with the distribution of Merchandise at Venues, royalty earnings pursuant to this Agreement, and the balance of royalties recouped or payable hereunder, and will be accompanied by payment of any royalties due after deductions in accordance with the provisions of this Agreement.

With respect to Tours outside of the United States, royalties shall be computed in the currency of the country where earned and credited to Licensor's account in U.S. dollars at the exchange rate received by PAID at the time of conversion. PAID may, if necessary, deposit any royalties due Licensor in an account bearing Licensor's name in the country where such royalties are earned. Any such deposit will constitute a royalty payment hereunder. If PAID is required to pay a tax on Licensor's behalf due to the earnings or liability of Licensor in such country, PAID may deduct the full amount of such tax from any monies payable to PAID to repay PAID such amount. After and such deduction or repayment, PAID shall provide Licensor with tax certificates in Licensor's name for such amount.

10. RIGHTS

A. Artist Material

Any content or material provided by Artist or Licensor to PAID, or that has been previously approved by Artist or Licensors, shall be deemed approved by Artist and Licensor and may be used by PAID for any purpose to promote the Website, Fan Club, Merchandise, Ticketing Packages, Fan Experiences, Travel Packages and Mobile Fan Club, except as otherwise specified in writing by Licensor and subject to any limitations about or which Licensor notifies PAID in writing. If Licensor withdraws its approval of any materials previously provided by them, then PAID shall use its commercially reasonable efforts to discontinue on a prospective basis only the use thereof as soon as practicable; provided that PAID shall continue to have the right to sell any Merchandise and distribute any materials that may embody such previously approved materials or content in accordance with the terms and conditions of this Agreement, until it has either exhausted its existing stocks thereof or six (6) months after, whichever is sooner. PAID shall have the right to use such material to promote PAID, subject to prior written approval by Licensor, which may be withheld or withdrawn at Licensor's reasonable discretion. Upon the expiration of this Agreement, PAID shall not retain any rights to materials supplied by Licensor and/or Artist, owned by Licensor and/or Artist, or on behalf of Licensor and/or Artist, to PAID, such as artwork, trademarks, logos, text, graphics, audio, video, data, the Artist URL, and the domain name(s) assigned to the Fan Club, or to any rights acquired from third parties by Licensor and/or Artist in connection with the Website, Fan Club or Merchandise (collectively, the "Artist Material"). Licensor grants to PAID during the Term worldwide a non-exclusive, royalty-free license to use, copy, modify (solely for technical purposes), distribute, publicly perform and display, and otherwise exploit the name, approved likeness and approved biography of Artist and the Artist Material in connection with the development, maintenance and operation, advertising, and promotion of the Website, Fan Club, Merchandise, Ticketing Packages, Fan Experiences, Travel Packages and Mobile Fan Club. Nothing contained in this Section shall supersede Artist's right to approve the final use and concept, in which the Artist Material shall be utilized, such approval not to be unreasonably withheld.

B. Developed Content

Licensor shall own all text, graphics, audio, video, artwork, and designs created by PAID or its employees or agents specifically relating to Artist for the purpose of providing content for the Website (collectively, the "Developed Content"). All Developed Content shall be deemed included in the royalty-free license granted by Licensor to PAID under the terms of this Agreement. Upon Licensor's reasonable request, PAID shall assist Licensor in the procurement and maintenance of the Developed Content (including all intellectual property rights, whether now known or hereafter developed) by providing appropriate documentation relating to Licensor's rights in the Developed Content.

C. PAID Content

Any HTML formatting code, source and object code, programming code and software, and any other such technical content built and/or created by PAID for its clients (i.e., Membership Administration, e-commerce and business administration infrastructure), shall remain the property of PAID ("PAID Content"), and, therefore, neither Licensor nor Artist shall have the right to claim ownership rights in and to any PAID Content. Neither Licensor nor Artist shall be entitled to use any name, trademark or service mark of PAID or its affiliates in any manner without obtaining the prior written consent of PAID.

D. <u>Return of Content</u>

Promptly after the expiration or earlier termination of the Term, PAID will deliver to Licensor or its designee all of the Artist Material and Developed Content in a mutually agreed upon technical format (e.g., computer disks, file transfer, etc.).

11. <u>TERM; TERMINATION</u>

A. <u>Term</u>

The Term of this Agreement shall commence on the Effective Date and continue for a period of the later of five (5) years, or until the full recoupment of the Advance, or through the attendance by 50,000 Qualified Attendees at live Concerts, whichever is longer, unless otherwise terminated pursuant to this Agreement (the "Term"); provided that if any of the foregoing dates occurs while Artist is on Tour, this Agreement will continue in full force and effect and shall not terminate until the completion of Artist's Tour leg then in progress; and provided further that in the event that PAID if fully recouped from its Advance, Licensor may elect to terminate PAID's right to sell Merchandise at retail/wholesale and/or on tour. For purposes of determining whether the Term has expired as a result of PAID's full recoupment of the Advance(s), recoupment shall be deemed to have occurred as of the date of the statement of account due from PAID to Licensor, which statement indicates that profits earned by Licensor, which profits are subject to recoupment pursuant to the terms of this Agreement (and are not, for example, paid through to Licensor pursuant to the terms of this Agreement) have exceeded the Advance paid by PAID hereunder.

B. <u>Effect of Termination</u>

Upon the termination of this Agreement or expiration of the Term, all rights granted to PAID hereunder shall forthwith terminate and automatically revert to Licensor, provided, however, that following the expiration (rather than an early termination by either party) of the Term, PAID shall be entitled for a period of one hundred eighty (180) days thereafter (the "Sell-Off Period") to continue to sell, on a non-exclusive basis, only existing inventory of Merchandise solely in accordance with the terms of this Agreement, except that PAID shall not be permitted to sell such Merchandise in or about Concerts at which Artist is performing. PAID shall not manufacture Merchandise during the Term in anticipation of the opportunity to sell during the Sell-Off Period. PAID will not mark down the price of any Merchandise unusually for sale in anticipation of the end of the Term or during the Sell-Off Period. Notwithstanding the foregoing, Licensor may purchase from PAID, at cost of manufacture, all unsold Merchandise in lieu of permitting PAID to exercise its sell-off rights. Within thirty (30) days after the expiration of the Sell-Off Period, if any, PAID shall supply Licensor with a written report of the sales of Merchandise during the Sell-Off Period, as well as the profits due. With respect to any Merchandise inventory remaining upon expiration of the Sell-Off Period, Licensor shall purchase such inventory, in whole or in part, at the cost of manufacture. Following the expiration or earlier termination of this Agreement for any reason, PAID will continue to commission all third party licenses entered into pursuant to this Agreement during the Term of this Agreement for the term of such licenses, including any extensions or renewals thereof. Moreover, PAID shall have the right to commission during their original term and any extensions or renewals thereof, all third party licenses and sponsorship or endorsement agreements entered into during the one-year period following the Term, provided such licenses and/or sponsorship or endorsement agreements were solicited by PAID during the Term.

lawful authority, or act of God. In such event, the party so prevented shall immediately notify the other party in writing of the detail for such prevention.

IN WITNESS WHEREOF, this Agreement has been executed as of the date and year first written above.

PAID, INC.

By: _____
Name: Greg Rotman
Title: CEO

MENUDO ENTERTAINMENT, LLC

By: _____
Name: Dimy Brinkin
Title: Co-CEO