UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE: 17-cv-21559

IN MIAMI PRODUCTION, LLC.
A Florida LLC,

**Defendant/Third-Party Plaintiff,**                           HEARING REQUESTED

v.

**Didier Hernandez, an individual, and
TRADING CONNECTIONS, LLC,
A Florida LLC,**

**Third-Party Defendants**
_____/

### IMP'S MOTION FOR PRELIMINARY INJUNCTION AGAINST DIDIER HERNANDEZ AND TRADING CONNECTIONS, LLC

NOW COMES Third-Party Plaintiff, In Miami Productions, LLC ("IMP") and hereby moves for the entry of a preliminary injunction against Third Party Defendants Didier Hernandez ("Mr. Hernandez") and Trading Connections, LLC ("Trading Connections")(collectively the "Defendants") and in support states as follows:

**I.   INTRODUCTION**

IMP is the only party in this case that has used the MENUDO trademark in the last 9 years. Despite this undisputed fact, these Third Party Defendants decided to intentionally promote and advertise services bearing confusingly similar imitations of IMP's MENUDO trademarks (MENUDO, MENUDO MANIA, MENUDOMANIA FOREVER and MENUDOMANIA4EVER (collectively the "MENUDO MANIA Marks"). within this District and throughout the United States. Specifically, IMP has obtained evidence clearly demonstrating that the Defendants are engaged in the advertising and promotion of *identical* services bearing IMP's MENUDO MANIA Marks. IMP also has obtained, and hereby

1

presents, direct evidence that the Defendants are also unjustifiably and maliciously interfering with IMP's contracts and business relationships. Based on this evidence, IMP's Third Party Complaint. (Doc. 89) alleges claims for trademark infringement, false designation of origin, and tortious interference.  Upon information and belief, the Defendants' escapades are being funded by the Plaintiff and/or its principals. *See* Exhibit 1, Declaration of Cristina Bruan  ("Bruan Decl.") at ¶37, attached hereto.

The Defendants' unlawful activities have deprived and continue to deprive IMP of its right to determine the manner in which its trademarks are presented to the public. Indeed, the Defendants have, and continue to, wrongfully trade and capitalize on the reputation, goodwill, and commercial value generated by and through IMP's production of 18 performances of a musical group that uses the name "Menudo" in connection with the rendering of their services (not to mention the advertising and promotion related thereto). The Defendants should not be permitted to continue their unlawful and infringing activities, all of which are causing IMP to suffer ongoing irreparable harm. IMP is also legally entitled to have an expectation in the continuity in its business relations and contracts without unjustified and malicious interference by the Defendants.

Accordingly, IMP is seeking entry of a preliminary injunction prohibiting the Defendants' (and their conspirators) from furtherance wrongful use of IMP's MENUDO MANIA Marks and poaching of its band members until this matter is heard on the merits on or before the previously set trial date of August 6, 2018.

## II.   STATEMENT OF FACTS

IMP provides services for live musical groups, including artist management, development, booking and promotions.  *See* Bruan Decl. at ¶5.  One of IMP's musical groups is

a group of male singers and performers that are all former members of the Latin boy band called "Menudo". *See Id* at ¶6. "Menudo" was originally a Puerto Rican boy band formed in the 1970s. *See Id* at ¶7. Menudo was extremely successful, especially throughout the 1980s, and became the most popular Latin American teen musical sensation of the time. *See Id* at ¶ 8. In 1996 the group released their last album under the Menudo name. *See Id* at ¶ 9.

In 2007 MTV announced that Menudo would return. *See Id* at ¶ 10. The announcement indicated that the group would find new boys to form a new band through a reality television series entitled "Making Menudo". *See Id*. The show debuted on October 25, 2007 and concluded just weeks later on November 20, 2007. *See Id*. After the show concluded the new members went on a brief tour together, but the group disbanded in early 2009 and "went dormant in 2009 to the disappointment of millions of fans around the world." *See Id* at ¶ 11.

Nobody used the mark MENUDO in any fashion between 2009 and 2014. *See Id* at ¶ 12. In fact, since 2009, nobody has used the mark except IMP. *See Id*. In 2014, IMP began working with former members who had expressed their desire to return to the stage and make a living doing what they love. *See Id* at ¶ 13. On January 31, 2015, IMP presented its first concert with the former Menudo members in Miami, Florida under the banner "El Reencuentro". *See Id* at ¶ 14. The show was a success, but IMP wanted to ensure the fans knew this was a reunion of the Menudo members they knew and loved. *See Id* at ¶ 14.

Given the fact that no one else was promoting any of the former band members or the band Menudo, and because the prior users abandoned the MENUDO trademark, IMP saw this as an opportunity to bring the former Menudo members back to their die-hard fans. *See Id* at ¶ 15. In May 2015, IMP produced and presented concerts featuring former Menudo members in New York and Florida under the touring name El Reencuentro. *See Id* at ¶ 16. In October, November

and December of 2015, IMP produced shows in Mexico and Ecuador, this time under the touring name Menudo. *See Id* at ¶ 17. In February 2016, IMP hosted a convention in Miami, Florida for Menudo super fans where it presented live musical performances by former Menudo members. *See Id* at ¶ 18. IMP sold related merchandise using the "MENUDO MANIA Marks, and created the Menudo & MENUDOMania4ever Facebook, Instagram & Twitter pages and launched a website www.menudomania4ever.com to support its tour. *See Id*.

Since 2015 IMP has produced, promoted and sold over 18 concert events using its various MENUDO MANIA Marks, which have received widespread praise and have been a success. *See Id* at ¶ 19. IMP's MENUDO MANIA Marks are not used to promote a "new band", but instead are used to brand IMP's mega show that reunites former Menudo members spanning three to four generations in celebration of the original group's fame and fandom. *See Id* at ¶ 23. IMP has invested significant sums of money, over $300,000.00, time and various resources in promoting and developing the MENUDO MANIA Marks. *See Id* at ¶ 21. Since 2014, IMP has worked with numerous former Menudo members, to produce live concerts and provide work and financial stability to more than 11 of the 35 former members of Menudo and to more than 15 musicians and crew on tour. *See Id* at ¶¶ 20-22.

In October 2016, IMP began planning IMP's 40th Anniversary Menudo Reunion Tour, and continued to plan and promote the tour throughout 2017. *See Id* at ¶ 25. In December 2017, IMP agreed to add former Menudo members Rene Farrait and Ray Reyes to its 40th Anniversary Reunion Tour lineup. *See Id* at ¶ 27. Mr. Farrait agreed to be used on IMP's promotional materials and both Mr. Farrait and Mr. Reyes announced they would be joining IMP's 40th Anniversary Reunion Tour on social media. *See Id* at ¶ 28 – 29; 36.

On or about February 15, 2018, Mr. Farrait informed IMP that he was approached by

4

Didier Hernandez to participate in a 40th Anniversary Menudo Reunion Tour being produced by Didier Hernandez and/or Trading Connections.  *See Id* at ¶ 30. Mr. Farrait was offered $22,500 in cash in exchange for terminating his agreement with IMP and signing an exclusive booking agreement, prohibiting him from working on any other ex-Menudo tour for a year, even if Mr. Hernandez and/or Trading Connections failed to book any tour or provide any work to Mr. Farrait. *See Id* at ¶ 31. Mr. Farrait entered into the exclusive booking agreement with Mr. Hernandez, causing him to quit IMP's tour and terminate his clear agreement and commitment to tour with IMP.  *See Id* at ¶ 32.

On February 21, 2018, a promoter informed IMP that Mr. Hernandez was actively promoting a copy-cat 40th Anniversary Reunion Tour. *See Id* at ¶ 33. Mr. Hernandez's promotion materials bear the MENUDO trademark. *See Id* at ¶ 34.  On or about March 14, 2018, IMP learned that Mr. Hernandez contacted Ray Reyes, and offered him the same deal; $22,500 to terminate his agreement with IMP and sign an exclusive booking agreement with Mr. Hernandez and Trading Connections. *See Id* at ¶ 35.  On or about March 18, 2018, IMP received word from another member, Sergio Blass, that Mr. Hernandez also contacted him and offered him the same terms. *See Id* at ¶ 37.  Clearly, Trading Connections and/or Mr. Hernandez are on a vicious spree aiming to disrupt and interfere with agreements that IMP has with its musicians and must be stopped. *See Id* at ¶ 38-39.

IMP has been we are intensely planning and promoting tour its 40th Anniversary Reunion Tour for the last three (3) years throughout the United States.  *See Id* at ¶ 42. Mr. Hernandez is using the same marketing avenues as IMP to promote his copy-cat 40th Anniversary Reunion Tour.  *See Id* at ¶ 43.  Further, Mr. Hernandez and Trading Connections' promotional materials advertise and promote services that are identical to those offered by IMP

5

and contain trademarks that are identical and include the primary portion of the MENUDO MANIA Marks. *See Id* at ¶ 40 -41.

Neither Mr. Hernandez nor Trading Connections have any economic interest in any former Menudo members - including Mr. Farrait, Mr. Reyes and Mr. Blass - joining IMP's 40th Anniversary Reunion tour. *See Id* at ¶ 45. Furthermore, Trading Connections does not have any economic interest in IMP putting on its 40th Anniversary Reunion Tour. *See Id* at ¶ 46.

IMP has and continues to expend significant time, energy and sums of money developing its Menudo reunion tours featuring former Menudo Band members, specifically its 40th Anniversary Reunion Tour. *See Id* at ¶ 47, 48. Moreover, IMP is the only company that has actually used the MENUDO trademark in any fashion since 2009; that is, up until Mr. Hernandez's recent counterfeit uses. *See Id* at ¶ 52.

Without an injunction, IMP will suffer severe substantial hardship, and consumers will be misled. If Mr. Hernandez and Trading Connections are not enjoined, IMP will have to cancel its tours, and risks losing over $1,035,000.00. *See Id* at ¶ 51. Further, If Mr. Hernandez and Trading Connections continue to use trademarks that are virtually identical to the MENUDO MANIA Marks, consumers will be deceived or misled into thinking the advertised tour is actually IMP's tour or otherwise sponsored by or authorized by IMP. *See Id* at ¶ 53.

Mr. Hernandez and Trading Connections have already caused IMP severe economic damage and hardship. *See Id*. If this court does not prevent them from continuing to poach IMP's band members, unlawfully using the MENUDO MANIA Marks, and ultimately prevent them from putting on a copy-cat tour, the damage to IMP's business and reputation will be irreparable. *See Id*.

III.   ARGUMENT

6

### A. A Preliminary Injunction is Necessary to Prevent Further Irreparable Harm.

In this Circuit, in order to obtain a preliminary injunction, a party must establish "(1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered if the relief is not granted; (3) that the threatened injury outweighs the harm the relief would inflict on the non-movant; and (4) that entry of the relief would serve the public interest." *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1225-26 (11th Cir. 2005); *See also Levi Strauss & Co. v. Sunrise Int'l Trading Inc.,* 51 F.3d 982, 985 (11th Cir. 1995) (affirming entry of preliminary injunction). As fully set out below, IMP's evidence establishes all of the relevant factors in favor of granting its motion for preliminary injunction against the Defendants.

**1. Likelihood of Success on the Merits**

IMP seeks an injunction against the Defendants for: (1) false designation of origin and false representation (Lanham Act, 15 U.S.C. §1125(a)); (2) statutory trademark infringement under Florida Law; (3) Florida common law common law trademark infringement; and (4) tortious interference with a business relationship. IMP is likely to succeed on all four of its claims against the Defendants.

*(a) False designation of origin and false representation*

Section 43(a) of the Lanham Act creates a federal cause of action for unfair competition by prohibiting the use in interstate commerce of any "word, term, name, symbol or device, . . . or any false designation of origin . . . which is likely to cause confusion . . . as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person." 15 U.S.C. § 1125(a). To establish a prima facie case of trademark infringement under § 43(a) of the Lanham Act, a plaintiff must show "(1) that it had trademark rights in the mark or name at issue and (2) that the other party had adopted a mark or name that was the same, or

confusingly similar to its mark, such that consumers were likely to confuse the two." *Lone Star Steakhouse & Saloon, Inc. v. Longhorn Steaks, Inc.*, 106 F.3d 355, 358 (11th Cir. 1997). IMP's evidence supports both of these factors.

To satisfy the first element of § 43(a)—proof of a valid trademark—IMP need not have a registered mark. The Eleventh Circuit has recognized that "the use of another's unregistered, i.e., common law, trademark can constitute a violation of § 43(a) where the alleged unregistered trademarks used by the plaintiff are so associated with its goods that the use of the same or similar marks by another company constitutes a false representation that its goods came from the same source." *Conagra, Inc. v. Singleton*, 743 F.2d 1508, 1512--13 (11th Cir. 1984). Here, it is clear that IMP has rights in and to the MENUDO MANIA Marks. *See* Bruan Decl. at ¶12 – 25; 42; 47; 52 – 53.

In determining the second element, the Eleventh Circuit uses a seven-factor likelihood of confusion, not unlike those employed by other Circuits. *See Ross Bicycles, Inc. v. Cycles USA, Inc.*, 765 F.2d 1502, 1506 (11th Cir. 1985). These factors, as outlined in *Safeway Store, Inc. v. Safeway Discount Drugs, Inc.*, are: (1) the strength of the mark; (2) the similarity of marks; (3) the similarity of the goods; (4) similarity of the sales methods; (5) the similarity of advertising media; (6) defendants' intent; and (7) evidence of actual confusion. *See Safeway Store, Inc. v. Safeway Discount Drugs, Inc.*, 675 F.2d 1160, 1164 (11th Cir. 1982); *see also Lipscher v. LRP Publ'ns, Inc.*, 266 F.3d 1305, 1303 (11th Cir. 1997). The seven factors listed are to be weighed and balanced and no single factor is dispositive. *Id*.

  i. <u>Strength of the Menudo Mania Marks</u>

A trademark's strength is determined by viewing the mark in its entirety as it appears in the marketplace. *See Lone Star Steakhouse and Saloon, Inc. v. Longhorn Steaks, Inc.*, 106 F.3d

8

355, 362 (11th Cir. 1997). The fact finder should assess the strength of the mark in two ways: first by classification (generic, descriptive, suggestive or arbitrary) and second "the degree to which third parties make use of the mark." *Fla. Int'l Univ. Bd. of Trs. v. Fla. Nat'l Univ., Inc.*, 830 F.3d 1242, 1256 (11th Cir. 2016), quoting *Frehling Enters. v. Int'l Select Group, Inc.*, 192 F.3d 1330, 1335 (11th Cir. 1999). "The less that third parties use the mark, the stronger it is, and the more protection it deserves." *Id*.

As to the first factor, the spectrum of protectability and strength for trademarks is divided into four primary types of designations: (1) coined, fanciful or arbitrary; (2) suggestive; (3) descriptive; and (4) generic. See *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768, 112 S. Ct. 2753, 120 L.Ed.2d 615 (1992). Arbitrary or fanciful marks are the strongest and deemed inherently distinctive and entitled to protection. *See Id*. It cannot be seriously disputed that the MENUDO MANIA Marks are strong, arbitrary and fanciful marks.

As to the second factor, no third parties have used the MENUDO trademark in commerce since 2009. *See* Bruan Decl. at ¶ 11-12; 52. IMP recognizes that the Menudo band was the most popular Latin American teen musical group in the 1980s and was arguably one of the most popular pop acts in the world at the time. However, given IMP's extensive and exclusive use since 2015 consumers have come to recognize IMP as the exclusive legitimate source of Menudo authentic performances in this decade. In other words, IMP has established secondary meaning in relation to the MENUDO trademark. The Court considers four factors in assessing secondary meaning: (1) "the length and nature of the name's use," (2) "the nature and extent of advertising and promotion of the name," (3) "the efforts of the proprietor to promote a conscious connection between the name and the business," and (4) "the degree of actual recognition by the public that

9

the name designates the proprietor's product or service." *Conagra, Inc. v. Singleton,* 743 F.2d 1508, 1513 (11th Cir. 1984).

IMP has invested significant sums of money, over $300,000.00, time and various resources in promoting and developing the MENUDO MANIA Marks. *See* Bruan Decl. at ¶21. Since 2015, IMP has produced, promoted and sold over 18 wildly popular concert events using the various MENUDO MANIA Marks, including the MENUDO trademark. The resurgence in popularity of the Menudo trademark is due solely to IMP's use. Moreover, this use has come to associate any and all Menudo concerts with IMP, given its exclusively coupled with its acquired secondary meaning. This factor weighs in favor of IMP.

    ii.  <u>Similarity of the Marks</u>

Likelihood of confusion is greater when an infringer uses the exact trademark. *Turner Greenberg Assocs. v. C & C Imps.*, 320 F. Supp. 2d 1317, 1332 (S.D. Fla. 2004). The Defendants are using marks that are identical and include the primary portion of the MENUDO MANIA Marks. *See* Bruan Decl. at ¶41.

    iii.  <u>Similarity of the Goods.</u>

"The greater the similarity between the products and services, the greater the likelihood of confusion." *John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 976 (11th Cir. 1983). The Defendants are advertising and promoting the identical services, namely entertainment and live musical performance services, offered by IMP. *See* Bruan Decl. at ¶40. Defendants are offering identical services to IMP's: a Menudo reunion tour. Standing alone, this similarity can be held sufficient to establish a likelihood of confusion. *See John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 976 (11th Cir. 1983).

    iv.  <u>Similarity of Sales Method & Advertising Method</u>

Convergent marketing channels increase the likelihood of confusion. See *Turner Greenberg Assocs.*, 320 F. Supp. 2d at 1332.  Both IMP and the Defendants promote and advertise their services using at least one of the same marketing channels, Facebook, in the same geographical distribution areas within the United States, including the Southern District of Florida. *See* Bruan Decl. at ¶43.  Thus, the conditions of purchase for both parties are unmistakably identical. Defendants are directly competing with the Plaintiff's services and marketing to the same consumers. *See* Bruan Decl. at ¶43.

    vi.  The Defendants' Intent.

In this District, it has been held that when an alleged infringer adopts a mark "with the intent of obtaining benefit from the plaintiff's business reputation, 'this fact alone may be sufficient to justify the inference that there is confusing similarity.'"  *Turner Greenberg Assocs.*, 320 F. Supp. 2d at 1333, citing *Carnival Corp. v. Seaescape Casino Cruises, Inc.*, 74 F. Supp. 2d 1261, 1268 (S.D. Fla. 1999). In a case of clear-cut copying, it is appropriate to infer that the Defendants intended to benefit from IMP's reputation, to IMP's detriment. *See Playboy Ent., Inc. v. P.K. Sorren Export Co. Inc. of Florida*, 546 F. Supp. 987, 996 (S.D. Fla. 1982).

    vii. Evidence of Actual Confusion.

Actual confusion is unnecessary to establish infringement, since the test is likelihood of confusion.  *See Frehling Enters. v. Int'l Select Group, Inc.*, 192 F.3d 1330, 1340 (11th Cir. 1999). In this case, however, it is reasonable to infer actual confusion exists in the marketplace based upon the circumstantial evidence available.  The Defendants are advertising and promoting services that are identical to those offered by IMP, using marks which are identical in appearance to IMP's MENUDO MANIA Marks. *See* Bruan Decl. at ¶40-41. IMP was even contacted by a

11

promoter in Mexico that they had received promotional materials for what looked like a "knock off" tour. *See* Bruan Decl. at ¶33.

Each of the seven factors this Court must consider weigh only in IMP's favor. IMP has therefore shown a probability of success on the merits of its trademark infringement claim.

   *(b) Florida Trademark Infringement and Common Law Infringement*

Whether a defendant's use of a plaintiff's trademark creates a likelihood of confusion between the plaintiff's and the defendant's services is also the determining factor in the analysis of trademark infringement under the Florida Statute §495.161 and under Florida's common law. *Rolex Watch U.S.A., Inc. v. Forrester*, No. 83–8381–Civ-Paine, 1986 WL 15668, at *3 (S.D. Fla. Dec. 9, 1987) ("The appropriate test for determining whether there is a likelihood of confusion, and thus trademark infringement, false designation of origin, and unfair competition under the common law of Florida, is set forth in *John H. Harland, Inc. v. Clarke Checks, Inc*., 711 F.2d 966, 972 (11th Cir. 1983.)".).

As set forth *supra*, IMP has established there is a likelihood of confusion regarding the Defendants' use of the Menudo Mania Marks in connection with the advertising and promotion of their infringing services. Accordingly, IMP is also likely to succeed on the merits of its state law claim for trademark infringement.

   *(c) Tortious Interference with a Business Relationship*.

Under Florida law, "[t]he elements of tortious interference with a contract or business relationship are: (1) the existence of a business relationship, not necessarily evidenced by an enforceable contract, under which the plaintiff has legal rights; (2) the defendant's knowledge of the relationship; (3) an intentional and unjustified interference with the relationship by the

defendant; and (4) damage to the plaintiff as a result of the interference." *Salit v. Ruden, McClosky, Smith, Schuster & Russell, P.A.*, 742 So. 2d 381, 385–86 (Fla. 4th DCA 1999) (citing *Tamiami Trail Tours, Inc. v. Cotton*, 463 So. 2d 1126, 1127 (Fla. 1985); *Procacci v. Zacco*, 402 So. 2d 425, 426 (Fla. 4th DCA 1981); *Linafelt v. Bev, Inc.*, 662 So. 2d 986, 989 (Fla. 1st DCA 1995)).

Tortious interference typically turns upon whether the interference was intentional and unjustified. *Heavener, Ogier Servs. v. R. W. Fla. Region*, 418 So. 2d 1074, 1076, 1982 Fla. App. LEXIS 20772. "The question of whether appellants' admittedly intentional interference was unjustifiable depends upon a balancing of the importance, social and private, of the objective advanced by the interference against the importance of the interest interfered with, considering all circumstances among which the methods and means used and the relation of the parties are important." *Insurance Field Services, Inc. v. White & White Inspection & Audit Service, Inc.*, 384 So.2d 303 (Fla. 5th DCA 1980) citing Restatement 2d, Torts § 767 and comments..

In this case Mr. Hernandez and Trading Connections had express knowledge of the business relationship between IMP and its musicians. *See* Exhibit 2, Transcript of October 3 Evidentiary Hearing, 128:5-7 (confirming that Mr. Hernandez attended the PI hearing in this case, which included testimony from Ms. Bruan regarding IMP's 40th Anniversary Reunion Tour). They have intentionally and unjustifiably interfered with such relationship by poaching Mr. Reyes and Mr. Farrait from IMP, causing damage and disrupting the relationship between IMP and its musicians. Accordingly, Florida law demands that Mr. Hernandez and Trading Connections be enjoined from further interfering with the remaining relationships in place between IMP and its musicians. *Ogier Servs. v. R. W. Fla. Region*, 418 So. 2d 1074, 1982 Fla. App. LEXIS 20772.

13

**2. IMP is Suffering Irreparable Injury.**

As the Eleventh Circuit noted: "[A] sufficiently strong showing of likelihood of confusion [caused by trademark infringement] may by itself constitute a showing of … [a] substantial threat of irreparable harm." *Ferrellgas Ptnrs., L.P. v. Barrow*, 143 Fed. Appx., 180, 191 (11th Cir. 2005) (citing *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1310 (11th Cir. 1998)). Such a finding of irreparable injury following a showing of likelihood of confusion is virtually always made in a case such as this, where a plaintiff has demonstrated it will lose control of its reputation as a result of a defendant's activities. *Id*. A likelihood of confusion exists herein because the Defendants have engaged in infringing activities using spurious designations indistinguishable from the Menudo Marks.

IMP will also continue to suffer irreparable injury if Mr. Hernandez and Trading Connections continue to poach former Menudo members committed to IMP's 40th Anniversary Tour. Further poaching will cause cancellation of the tour and severe economic damage. *See* Bruan Decl. at ¶ 51.

**3. The Balance of Hardship Tips Sharply in IMP's Favor.**

IMP has expended substantial time, money, and other resources to develop the quality, reputation, and goodwill associated with the MENUDO MANIA Marks. *See* Bruan Decl. at ¶ 21. Should the Defendants be permitted to continue their unlawful activities, IMP will suffer substantial losses and damage to its reputation and damage to its business relationships *See* Bruan Decl. at ¶ 49; 53. However, the Defendants will suffer no legitimate hardship in the event a preliminary injunction is issued, because the Defendants have no legal right to engage in their activities. Moreover, the Defendants have not produced a single performance using the infringing marks. Enjoining Didier Hernandez and Trading Connections for a brief four-month

14

period while the Court hears the evidence is not unduly prejudicial, and merely serves to remain the status quo.

### 4. The Relief Sought Serves the Public Interest.

The Defendants are engaged in unlawful activities and are attempting to defraud consumers by advertising and promoting their musical entertainment services as IMP's live musical performance services. Consumers have an interest in not being misled as to the origin, source, or sponsorship of trademarked services. *See Nailtiques Cosmetic Corp. v. Salon Sciences, Corp.*, 1997 WL 244746, 5, 41 U.S.P.Q.2d 1995, 1999 (S.D. Fla.1997) ("The interests of the public in not being victimized and misled are important considerations in determining the propriety of granting injunctive relief."). The public also has an interest in seeing IMP's performances, which are now at risk due to the Defendants' tortious conduct. Accordingly, the public interest favors an injunction when, as is the case here, the public risks continuing to be misled.

## IV. CONCLUSION

WHEREFORE, for the foregoing reasons, IMP respectfully requests that this Court enter an order temporarily enjoining Trading Connections LLC, its members, officers, agents, licensees, servants, employees, attorneys and all other persons in active concert or participation with them, including but not limited to Didier Hernandez, from:

a. Using the MENUDO trademark to plan, promote, and/or put on a 40th Anniversary Menudo Reunion Tour and/or any live musical performances of any kind;

    b. advertising or promoting any related live entertainment services using the MENUDO trademark or anything confusingly similar to the MENUDO trademark; and

    c. licensing the MENUDO trademark to any third party.

2. Any further relief as the Court deems just and proper.

Respectfully Submitted,
/s/ Vivek Jayaram
Vivek Jayaram
Johanna Hyman
Jayaram Law Group, Ltd.
125 S. Clark Street, 17th Floor
Chicago, IL 60603
646-325-9855
Email: vivek@jayaramlaw.com
Email: Johanna@jayaramlaw.com
Counsel for In Miami Productions LLC
Admitted Pro Hac Vice

Joshua Ryan Alhalel
Alhalel Law
777 Brickell Avenue, Suite 600
Miami, FL 33131
305-563-9060
Email: josh@alhalel-law.com
Local Counsel

**CERTIFICATE OF SERVICE**

The undersigned certifies that on March 23, 2018 he filed the foregoing Motion for Preliminary Injunction using the Court's CM/ECF electronic filing, which will electronically serve all counsel of record:

WOLFE LAW MIAMI, P.A.
RICHARD WOLFE
175 SW 7 Street
Latitude One Offices
Suite 2410
Miami, Florida 33130
rwolfe@wolfelawmiami.com

T. 305.384.7370
F. 305.384.7371
M. 305.401.3639

/s/Vivek Jayaram
Vivek Jayaram, Esq.
Jayaram Law Group
125 S. Clark Street
17th Floor
Chicago, IL 60603
vivek@jayaramlaw.com
T: 646.325.9855
Counsel for Defendants

Joshua Ryan Alhalel
Alhalel Law
777 Brickell Avenue, Suite 600
Miami, FL 33131
305-563-9060
Email: josh@alhalel-law.com
Local Counsel
